**Beatrice BRAUDE**

v.

**The UNITED STATES.**

**No. 451–77.**

United States Court of Claims.

Oct. 18, 1978.

Maxwell J. Mehlman, Washington, D. C., for plaintiff. Stuart J. Land, Washington, D. C., attorney of record; Arnold & Porter, Washington, D. C., of counsel.

Frank M. Rapoport, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before SKELTON, Senior Judge, and NICHOLS and KUNZIG, Judges.

---

1. Act of August 26, 1950 (Public Law 733), 81st Congress.

2. Public Law 207 allowed the Director of the USIA to terminate the employment of any person above the grade of GS–7 until January 1,

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Senior Judge:

This case is before the court on cross-motions for summary judgment. It is a civilian pay case, and the petition was filed September 12, 1977. Plaintiff, a former employee of the United States Information Agency, sues to recover back pay from the date of her discharge (effective December 31, 1953, but providing for her to receive a temporary appointment beginning January 1, 1954, not to exceed thirty days from the date of the letter informing her of her discharge which was dated December 30, 1953) until such time as she is reinstated to her former position.

Plaintiff began her career as a federal employee in 1943. For the next 10 years she worked in various government offices and always received favorable ratings for her work.

In 1951, while employed by the State Department, plaintiff became the subject of an investigation conducted pursuant to the Loyalty and Security Program.[1] In the course of that investigation she answered written interrogatories containing questions about two people whom she was alleged to have known and about certain organizations to which she was alleged to have belonged. After reviewing all of the information in its possession, including plaintiff's answers to the interrogatories, the Loyalty and Security Board voted unanimously to give plaintiff a complete clearance in regard to both loyalty and security.

On December 31, 1953, plaintiff was informed by letter from the Director of the United States Information Agency (USIA) that pursuant to Public Law 207[2] her em-

1954, notwithstanding the provisions of any other law, thereby allowing the Director to discharge employees who had accumulated so much tenure and seniority that they could not readily be discharged through the usual reduction-in-force techniques at the time the USIA

ployment by the USIA was being terminated. The reason for the termination was said to be large-scale reduction-in-force (RIF), stemming from a reduced budget.

After leaving her federal employment, plaintiff engaged in an almost continuous campaign to be rehired by the federal government, although she was never successful. After the passage of the Privacy Act of 1974, plaintiff acquired certain documents from her governmental records which she asserts establish that her dismissal was not an ordinary RIF, as she had been told, and reveal that she was actually discharged for security reasons. Thereafter, on September 12, 1977, plaintiff filed this suit contending that the Government deliberately concealed the true reason for her discharge in an illegal attempt to deny plaintiff the due process rights possessed by one discharged for security reasons and thereby sought to circumvent the Government's own regulations applicable to security terminations. The plaintiff claims that the regulations provided that prior to such a termination the plaintiff must be given a written notice of the charges and reasons for the discharge; that a hearing must be held wherein she could be represented by counsel, present witnesses on her own behalf, and cross-examine the witnesses against her; and that she could not be discharged by the Director of the USIA unless he had received a recommendation from the hearing board, had reviewed the record, and had found that a discharge was warranted.

■ We first consider the limitations issue, as we lack jurisdiction to hear any claim which is not filed within six years after such claim first accrues.[3] To facilitate discussion of this issue we will assume that all factual allegations in the petition are true.[4]

We held in *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358–59, 178 Ct.Cl. 630, 634 (1967):

In certain instances the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim. Ignorance of rights which should be known is not enough. *Art Center School v. United States*, 142 F.Supp. 916, 921, 136 Ct.Cl. 218, 227 (1956); *Thomas v. United States*, 125 Ct.Cl. 76, 80 (1953); *Dion v. United States*, 137 Ct.Cl. 166 (1956); *Navajo Freight Lines, Inc. v. United States*, 176 Ct.Cl. 1265 (1966). Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date. An example of the latter would be when defendant delivers the wrong type of fruit tree to the plaintiff and the wrong cannot be determined until the tree bears fruit. See 1 *Williston on Sales*, § 212(a) (Rev. ed. 1948). In this situation the statute will not begin to run until plaintiff learns or reasonably should have learned of his cause of action. Dawson, *Fraudulent Concealment and Statutes of Limitations*, 31 Mich.L.Rev. 875 (1933); Harv.L.Rev. *supra*. But cf. *Pickett v. Aglinsky*, 110 F.2d 628 (4 Cir. 1940); *Kennedy v. Johns-Manville Sales Corp.*, 135 Conn. 176, 62 A.2d 771 (1948).

■ The plaintiff has the burden of proof to establish either that "defendant has concealed its acts with the result that plaintiff was unaware of their existence or [she] must show the [her] injury was 'inherently unknowable' at the accrual date."

In the case at bar, plaintiff does not contend that the injury was inherently unknowable at the accrual date. The injury resulting from a termination of employ-

---

was established. Pub.L. No. 83–207, ch. 340, 67 Stat. 418 (1953).

**3.** 28 U.S.C. § 2501: *Soriano v. United States*, 352 U.S. 270, 273–274, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957).

**4.** See *Guessefeldt v. McGrath*, 342 U.S. 308, 310, 72 S.Ct. 338, 96 L.Ed. 342 (1952); *United States v. New Wrinkle, Inc.*, 342 U.S. 371, 373 (1952); *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358, 178 Ct.Cl. 630, 632, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967).

ment is obviously "knowable." Plaintiff asserts, however, that the Government concealed the true reason for her discharge and thereby caused her to be unaware of the existence of her claim.

In *Japanese War Notes Claimants Ass'n v. United States, supra,* 178 Ct.Cl. at 634–5, 373 F.2d at 359 we said:

> * * * Once the statute of limitations has been tolled [by the concealment], it is not necessary that plaintiff obtain a thorough understanding of all the facts to halt the suspension. Defendant is not required to wait until plaintiff has started substantiating [her] claims by the discovery of evidence. Once plaintiff is on inquiry that [she] has a potential claim, the statute can start to run. See, Mich.L.Rev., *supra,* at 912. This standard is in line with the modern philosophy of pleading which has reduced the requirements of the petition and left for discovery and other pretrial procedures the opportunity to flesh out claims and to define more narrowly the disputed facts and issues. See Ct.Cl. Rules 13–18, 38–46.

■ We find from the following facts that plaintiff was on inquiry that she had a potential claim at a date prior to six years before she filed her petition.

In her affidavit in support of her motion for summary judgment, plaintiff made the following statement concerning her thoughts near the time of the termination:

> While I was puzzled and felt that I might not have been told the entire story behind Mr. Streibert's action, I had no alternative but to believe * * *.

In a letter of February 22, 1956, from plaintiff to her attorney, Byron Scott, plaintiff stated that she called her old boss at the USIA seeking employment, and that he admitted that her old job was open but said he was trying to fill the position with someone in the agency. He advised plaintiff, however, "to speak with the Security Chief of the USIA, a Mr. Charles New [Noone], and discuss my possibilities frankly with him."

Also, in her affidavit, plaintiff stated, "Early in my efforts [to re-enter Federal employment] I heard that I had in fact been blacklisted by the federal government." This came to plaintiff's attention in 1958. A Ms. Orienter, who informed plaintiff of her being blacklisted, stated in plaintiff's exhibit 36, that plaintiff " * * * became quite disturbed as it was her first indication that her dismissal was not a routine one. I later learned that she had subsequently hired a lawyer to try and find out the truth of her dismissal."

On December 19, 1956, plaintiff's attorney wrote the Civil Service Commission and stated:

> Miss Braude's experience in attempting to regain Federal employment indicates that the material in Miss Braude's file is considered derogatory and even though she has never received a determination on the charges she has been disbarred effectively from Government employment.

On May 1, 1957, the General Counsel of the Civil Service Commission replied to a letter from plaintiff's attorney dated April 10, 1957, in which he stated: "The Commission has no authority to review the agency's decision even if it is granted that the reason Miss Braude was turned down is that the agency has derogatory information in her file."

Subsequently, plaintiff requested the intervention of Senator Jacob Javits. On February 27, 1958, a Mr. William Hull of the Civil Service Commission, in reply to the Senator's request for a review of Miss Braude's situation, a copy of which was forwarded to plaintiff, stated:

> Official records disclosed that Miss Braude was terminated by the USIA under the provisions of Public Law 207, 83rd Congress, effective December 31, 1953 * * * There is no evidence in the Commission's files that either of these terminations [referring also to the termination of plaintiff's temporary (30-day) appointment] resulted from an unfavorable determination on matters of security.

On June 8, 1965, a Mr. Reed Harris sent an internal USIA memo to a Mr. McNichol of the USIA Office of Security, to wit:

I attach a resume prepared by Miss Beatrice Braude, who has asked me whether there might be an opportunity for employment in USIA * * *. She later [after her dismissal] got the impression that the discharge may have been for security reasons, as in the past she had accidentally met and known slightly the notorious Judith Coplon * * *. Do you have sufficient information available to you in Washington to determine whether IOS [Office of Security] would be inclined to interpose an objection if Miss Braude were to apply again formally?

In a letter from plaintiff to Mr. L. Speiser of the American Civil Liberties Union, dated February 18, 1967, plaintiff stated that she had previously told Mr. Harris "the full story."

On July 20, 1965, Mr. Harris, the one to whom plaintiff had revealed "the full story," regarding her past security problems, wrote Miss Braude a letter in which he stated:

* * * [I]f an opening is suitable for several candidates, including you, all equally available, obviously there could be a tendency to lean toward others.

The plaintiff, in her affidavit, stated: "The foregoing remarks in Mr. Harris' letter to me of July 20, 1965, prompted me to contact the American Civil Liberties Union."

In a letter to Mr. John Burns, Chairman of the New York Democratic State Committee, dated December 15, 1966, David Bernstein, President and Editor of the Sun-Bulletin of Birmington, New York, stated that plaintiff, an old friend of both him and his wife, had informed them that:

[S]he has been barred for all practical purposes from Federal employment of any kind. The reason Beatrice thinks this is so is that in the 1950's at the request of a mutual acquaintance, she permitted Judith Coplon (involved in the transmission of official U.S. documents to Russia) to stay in her apartment in Paris for a few days while she (Mrs. Coplon) looked for a place of her own. Beatrice

was then on the Paris staff of the U.S. Information Agency.

Beatrice says she knew nothing about Judith Coplon at the time, and was simply accommodating a friend's request. A few months later, she was told that the USIA staff was being reduced and was sent home.

Actually, her account makes me believe her suspicion is well-founded. That kind of accident in association would have the kind of consequences she suffered, however innocent she was; and she would never be told officially the real reason.

In her letter of February 18, 1967, to Mr. Speiser of the American Civil Liberties Union, plaintiff acknowledged approaching the Bernsteins on a "personal basis" and having told them "the full story."

On January 4, 1967, the Director of the American Civil Liberties Union, which had been retained by plaintiff, wrote a letter to John Macy, Chairman of the U.S. Civil Service Commission, which made reference to the Commission's practice of sending its investigatory file, including the interrogatories submitted to the employee being investigated, to various employing agencies of the federal government. The letter suggested that plaintiff's past security problems were causing her problems, although he stated, "It is difficult, perhaps impossible, to prove that her failure to be hired is related to the circulation of the file with its charges and interrogatories."

On January 9, 1967, plaintiff, in a letter to a Regional Director of the Department of H.E.W., in which she sought employment, stated:

I'd simply like to assure you that I've always been a loyal and devoted civil servant. If you wish I can supply you with the names of former government colleagues now very high up in either government or in college administration work who would testify in my behalf.

After reviewing all of the above events, we reach the inescapable conclusion that prior to September 12, 1971, plaintiff was on inquiry that she had a potential claim.

Long before that date, as shown above, plaintiff felt that she had not been told the entire story about her discharge and had been advised by her former boss to frankly discuss re-employment possibilities with the Chief of Security. Plaintiff admitted learning that she had been "blacklisted" (a device used in the past against those whose loyalty was suspect). She also admitted that she was disturbed by indications that her dismissal had not been routine. The reply of the Civil Service Commission to the inquiry of Senator Javits in 1958 strongly implies that his office had been asked to look into the reason for plaintiff's termination and more specifically whether that termination was for security reasons. There was also the direct statement by Mr. Reed Harris in 1965, to whom plaintiff admitted having told the full story, that plaintiff believed that the true motive for her discharge was that she was believed to have been a security risk.

The very nature of statutes of limitations is that they deny a claim regardless of its merit. This often seems unfair. But it is the judgment of those vested with the authority to make our laws that such statutes are necessary in order to insure prompt handling of claims and to prevent actions from being withheld until such time that the memories of witnesses and other types of evidence have become obscured or unavailable by the passage of time. Furthermore, the policy considerations behind such statutes contemplate that ignorance of rights which should have been known is not enough to toll their running. And so it becomes clear, and we conclude, that the evidence before us establishes, as a matter of law, that the statute of limitations began to run as plaintiff acquired information and evidence which should have, and in the eyes of the law did, place her upon inquiry, prior to September 12, 1971, that she had a potential claim. This holds true notwithstanding plaintiff's contention that she did not have enough evidence to prove or substantiate her claim; for, just as plaintiff used the Privacy Act in 1974 as a means of acquiring the evidence needed to substantiate her alleged claim, she could have filed

her suit here and availed herself of the broad discovery powers afforded by this court to its litigants, and thereby have acquired the same evidence to prove her claim within the time allowed by the statute of limitations.

Accordingly, we hold that plaintiff's cause of action accrued at a date more than six years prior to her instituting suit in this court. *Japanese War Notes Claimants Ass'n v. United States, supra.* Therefore, plaintiff's claim is time-barred and outside this court's jurisdiction. Defendant's motion for summary judgment is granted and that of plaintiff is denied, and the petition is dismissed.

NICHOLS, Judge, concurring and dissenting:

The plaintiff's claim is set out in a somewhat unconventional manner in her petition, but essentially she states two causes of action or counts, one (I) for illegal firing from government employment in 1953, paragraphs 5–15, and two (II) for illegal blacklisting in that and subsequent years, paragraphs 16–19. I am inclined to agree with the panel, on the cross-motions for summary judgment, that plaintiff cannot maintain count II, for the reason that by her own presentation she believed she was blacklisted, more than six years before action brought. 28 U.S.C. § 2501. Should it be held that illegal blacklisting constituted a "continuing claim" other limits on Court of Claims jurisdiction would present insuperable barriers to the blacklisting count, considered separately from count I. Startling as it may seem, however, I think count I is not barred, or at least, cannot be held barred on summary judgment, despite the passage of twenty-three years, before suit was filed, because of purposeful concealment by defendant of facts essential to appreciation of the illegal nature of the alleged 1953 firing, concealment steadfastly maintained until abandoned in 1975 by compulsion of the Privacy Act of 1974, 5 U.S.C. § 552a. Accordingly, I concur in part and respectfully dissent in part. The discussion that follows relates only to count I, which I would not dismiss.

The case under count I cannot be properly decided merely by addressing the simplistic question of whether the plaintiff felt a sense of grievance more than six years before action brought. Of course she did. It presents the difficult question of whether the statute of limitations should be tolled when the defendant intentionally falsified to preclude the plaintiff from obtaining necessary substantial evidence to support her cause of action and was apparently successful in so doing, notwithstanding repeated efforts by the plaintiff to obtain information. For this reason the rationale of the *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 178 Ct.Cl. 630, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967), does not support the majority. The quotes in the majority opinion show that fraudulent concealment will toll the statute until a plaintiff is "on inquiry" that he has a "potential claim." The court in that case was not presented with a situation in which, as here, a mere sense of having a grievance is urged as inviting inquiry whether one can prosecute a money claim. I do not suggest we should hold now that the statute was tolled. I believe the facts that should control the tolling question are inseparably intermingled with the merits. Therefore, both summary judgment motions should be denied as to count I, and the cause should be remanded to the trial division.

This case concerns the termination of plaintiff's employment in the United States Information Agency (USIA) pursuant to Pub.L. No. 83–207, ch. 340, 67 Stat. 418 (1953). Plaintiff contends that she was discharged for security reasons without any notice or hearing, as required by the USIA Personnel Security Regulations, issued pursuant to Exec. Order No. 10450, 3 C.F.R. 936 (1949–1953 compilation), *reprinted in* 5 U.S.C. § 7311 at 581 (1976); that Pub.L. 207 was intended to be used only to effect a reduction in force, not to eliminate security risks; and that, even if Pub.L. 207 did permit a termination for security reasons, such a discharge would violate "established principles of due process." An alleged security risk was entitled not to be separated on security grounds except by security procedures, even if the agency head had discretion to fire on any or no ground. *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). Plaintiff's entire cause of action depends upon the basis for her discharge. She alleges a termination for security reasons, whatever defendant said at the time. What process is due depends on whether the discharge inflicts a stigma. *Conn v. United States*, 376 F.2d 878, 881, 180 Ct.Cl. 120, 127 (1967). Plaintiff's position in effect is that a security discharge affixes a stigma if it is reflected in government files to which prospective employers, or government agencies, have access. *Churchwell v. United States*, 545 F.2d 59 (8th Cir. 1976); *McNeill v. Butz*, 480 F.2d 314 (4th Cir. 1973). A stigma-type discharge inflicted without due process is illegal even when the employing authority could award a non-stigma discharge at its discretion. *Clackum v. United States*, 296 F.2d 226, 148 Ct.Cl. 404 (1960). Without any evidence whatever of the basis for her discharge, plaintiff had no due process claim that could be effectively prosecuted.

To understand the nature of the problem presented by this case, it is necessary to review in detail the facts surrounding plaintiff's termination and plaintiff's subsequent attempts to discover the reason therefor. On motions for summary judgment it is necessary to construe, and I do construe the facts in a light most favorable to the party against whom the motion is directed. *See Housing Corp. of America v. United States*, 468 F.2d 922, 199 Ct.Cl. 705 (1972); *Garcia v. United States*, 108 F.Supp. 608, 123 Ct.Cl. 722 (1952). The defendant has made virtually no attempt to deny plaintiff's allegations about the cover-up of the reasons behind plaintiff's termination, and plaintiff's allegations receive considerable support from USIA files obtained by plaintiff pursuant to the Privacy Act of 1974, 5 U.S.C. § 552a (1976).

Pub.L. 207, passed August 7, 1953, granted the Director of the USIA broad authority until January 1, 1954, to terminate the employment of anyone above the grade of

GS–7 not entitled to veterans' preference. The purpose apparently was to allow the director to effectuate a large reduction in force by eliminating unqualified personnel without regard to tenure or "bumping rights." Accordingly, the USIA established a number of criteria for selecting employees for termination pursuant to Pub.L. 207, including failure of an employee to "pull his weight," lack of need for particular qualifications held by an employee, obstructionist tendencies, physical conditions impairing his job effectiveness, and questions of loyalty. After a review for derogatory information of the personnel files of all employees eligible for termination, there was a review of the security files by the Division of Security. After a review by an informal committee the recommendations for termination were submitted to the director, who signed the termination letters. In accordance with the instructions of the director, "[t]he unit heads were cautioned not to get into 'specifics' [in such letters] as to the reasons why each employee was selected for termination." In a memorandum dated December 28, 1953, the Office of Security recommended termination of plaintiff's employment under Pub.L. 207. It assigned as a reason the security related facts revealed in an attached memorandum, e. g., that plaintiff's name was found in the address book of the once celebrated Soviet spy, Judith Coplon. As a result of the recommendation, the decision was made to terminate plaintiff's employment.

Plaintiff was informed by a letter dated December 30, 1953, from Theodore C. Streibert, the Director of the USIA, that her employment was to be terminated, effective in 30 days, pursuant to Pub.L. 207; the letter stated that the action was being taken because of a cut in appropriated funds necessitating a large-scale reduction in force, and it stated no other reason. No mention was made that plaintiff had any right to a review or hearing of any kind on the action. In reply to plaintiff's request for reconsideration, Streibert stated in a letter dated February 1, 1954, that he had to adhere to his original decision on the basis of the various budgetary factors mentioned in his prior letter; no mention was made of any factors relating to security being taken into consideration.

In a letter dated January 25, 1954, to Senator Irving M. Ives, who had written in behalf of plaintiff, Streibert again cited only budgetary reasons behind plaintiff's dismissal and made no mention of any possible security factors behind the action.

Plaintiff heard in 1956 from a personal friend that she had lost a job opportunity two years earlier because of her being blacklisted, and she retained an attorney. Because of his efforts, the Civil Service Commission rated plaintiff as "eligible" for federal employment; nonetheless, plaintiff was unable to obtain employment even though she had passed a Civil Service typing test with a perfect score. Senator Jacob Javits then wrote to the Civil Service Commission on plaintiff's behalf, and was informed that "[t]here is no evidence in the Commission's files that [plaintiff's termination] resulted from an unfavorable determination on matters of security."

In 1963 plaintiff was told by the Civil Service Commission in response to her request for a review of her case that "nothing in your files * * * would preclude your consideration for appointment to a position in the Federal service."

In 1964, plaintiff inquired with Reed Harris, Director of USIA's Information Center Service, about the possibility of obtaining employment in the USIA. She told him about her past security problems, and he sent a memorandum dated June 8, 1965, to Paul J. McNichol of the USIA's Office of Security. T. E. Hoffman of the same office then briefed Harris on plaintiff's security file and told him that she had been separated from the USIA "under the provisions of Public Law 207 after recommendation for such action was made by the Office of Security." Hoffman was of the view that a policy determination in regard to rehiring employees separated under Pub.L. 207 would have to be made before any new security determination on plaintiff would be made. Harris agreed that anyone "so

separated should only be re-employed if they had a particularly outstanding contribution to make" and that he would take no further action in reemploying plaintiff. Harris then sent plaintiff a letter dated July 20, 1965, stating that there was no suitable opening at the agency but that "if an opening is suitable for several candidates, including you, all equally available, obviously there could be a tendency to lean toward others." Plaintiff then approached the American Civil Liberties Union (ACLU), and Lawrence Speiser of that organization wrote a letter to Chairman John W. Macy, Jr., of the Civil Service Commission. Kimbell Johnson, Director, Bureau of Personnel Investigation, Civil Service Commission, then telephoned McNichol in regard to the ACLU complaints on behalf of plaintiff. McNichol told Johnson of the action taken in 1965 by Hoffman (at McNichol's request) in regard to plaintiff's job interview with Harris in 1964. Johnson told McNichol that "[h]e would tell [the ACLU] the reports in this case have not been in the possession of USIA since 1954 and therefore, could not have been circulated." The Office of Security had sent a number of FBI investigative files and other material related to the Loyalty Security Board investigation, which had exonerated plaintiff in 1951, to the Civil Service in 1954. However, information relating to the basis for plaintiff's job termination in 1953 was not turned over. Mr. Johnson said that from the viewpoint of the Civil Service Commission, he could handle the response to the American Civil Liberties Union "adequately."

Apparently Johnson's efforts were "adequate." Chairman Macy wrote in a letter dated February 14, 1967, to Lawrence Speiser that:

The staff's belief is that Miss Braude's difficulties are caused primarily by her seeking jobs for which there are many candidates and relatively few jobs. Another difficulty, the staff notes, is that she may be "scaring off" employment prospects by volunteering a recitation of her past loyalty clearance problems. Then, when no job offer is forthcoming,

she is inclined to think her record has followed her around, when, in fact, the record was never reviewed by the appointing officer.

The staff report enclosed with the letter concluded:

—the Civil Service Commission has found no indication that subject has been denied appointment from a civil service list of eligibles because of an unfavorable security determination by an agency.

—there is evidence that official records concerning subject's past difficulties regarding loyalty are not "following her around," so to speak, and thereby militating against her reemployment. Commission records show that no person from another Federal agency has reviewed subject's investigative file at the Civil Service Commission since 1948, and no agency has borrowed her file since 1954 when the U.S. Information Agency requested it in connection with employing Miss Braude.

—USIA's security officer stated recently that under his agency's present security standards, there would be no reason to deny security clearance to subject for regular employment in his agency. Another official of that agency recalled that Miss Braude was very favorably regarded by persons in the agency who knew and worked with her.

From the record, we must conclude for purposes of this motion there is ample evidence that the defendant made a calculated effort to prevent plaintiff and others acting in her behalf from obtaining any evidence to reveal the security reasons behind her termination. Yet the recommendation of the Office of Security of December 28, 1953, remained in her file and was discovered by plaintiff under the Privacy Act. It strains credulity that any agency would have hired her knowing of this, or would have been so neglectful as to fail to ascertain that such a document existed. Defendant, however, is free to prove if it can that the memorandum was not an effective stigma and was harmless.

Not knowing of this memorandum, plaintiff could not have known that her ostensible separation for budgetary reasons, neutral as to her future employability, actually had behind it a separation really for causes just as stigma-inflicting as an undesirable discharge for a soldier. There is some evidence in plaintiff's exhibit 36 that private prospective employers could obtain the knowledge concealed from plaintiff as readily as government agencies. Talk about a "blacklist" simply reflected ignorance as to how the system worked.

That plaintiff knew she had a grievance does not prove she knew she had a "claim," i. e., a demand for money or property. *Grumman Aerospace Corp. v. United States*, Ct.Cl., 579 F.2d 586 (decided June 14, 1978). She believed she was blacklisted which defendant denied, but any competent lawyer could have told her that a complaint for blacklisting sounded in tort and was not cognizable in the Court of Claims. The recitals of the majority, and the record, contain nothing to show she knew she had been illegally fired, or even suspected it. That is the indispensible gravamen of the present suit.

Tolling doctrines in statutes of limitations were originally created in courts of chancery and were predicated upon equitable considerations. *See Developments in the Law—Statutes of Limitations*, 63 Harv.L. Rev. 1177, 1219 (1950); Dawson, *Undiscovered Fraud and Statutes of Limitations*, 31 Mich.L.Rev. 591, 597 (1933).

In *Marcee v. United States*, 455 F.2d 525, 527, 197 Ct.Cl. 363, 367 (1972), we commented:

The CSC knows that statutes of limitations run on its determinations. We do not think it can validly start limitations running by the issuance of rulings to persons it knows, or has reason to suspect, are incompetent. *Cf. Capoeman v. United States*, 440 F.2d 1002, 1005, 194 Ct.Cl. 664, 673 (1971), and cases cited therein. The situation is, of course, not the same as fraud but we believe it has the same consequences as fraud with respect to limitations. Fraudulent concealment of significant facts from a claimant tolls the running of our statute of limitations. *Mulholland v. United States*, 165 Ct.Cl. 231 (1964). Defendant has not such clean hands that it can invoke the equitable doctrine of laches. But for this factor, limitations certainly would have run, as purportedly final rulings were issued over six years prior to the bringing of this action. * * *

The word "fraudulent" in this *Marcee* dictum may be too strong since in *Spevack v. United States*, 390 F.2d 977, 182 Ct.Cl. 884 (1968), defendant's concealment that it was infringing plaintiff's patent was held to toll the statute, though the concealment could hardly be called fraudulent. It was pursuant to regulations written for legitimate security reasons. In some respects, however, the situation before us is analogous to those involving duress or undue influence. In both such situations a plaintiff is prevented from bringing suit by the acts of the defendant, even though the plaintiff may have the knowledge of the essential facts. Nonetheless, courts have held that statutes of limitation do not begin to run until the termination of the duress or undue influence. *See Developments in the Law—Statutes of Limitations*, 63 Harv.L. Rev. 1177, 1219 (1950), 54 C.J.S. *Limitations of Actions* § 197 (1948).

The reason for such a treatment is that in such situations the plaintiff has been deprived by the defendant of the ability to seek legal redress for the wrongs visited upon him by the defendant's actions. In addition, the usual considerations behind statutes of limitations of protecting defendants from stale claims in which witnesses have disappeared and records and other evidence have been lost are often not present. The defendants not only have notice during the period the statutes are tolled of the potential claims against them, but are exerting their efforts to prevent the bringing of suits against them. The old doctrine that no man may take advantage of his own wrong is as applicable in the area of statutes of limitations as in other areas of the law. *See Glus v. Brooklyn Eastern District*

*Terminal*, 359 U.S. 231, 232–33, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959); *Fontana v. Aetna Casualty & Surety Co.*, 124 U.S.App.D.C. 168, 363 F.2d 297, 299 (1966).

If the plaintiff had made no effort to get at the truth, this court would be confronted with a considerably different situation. A plaintiff is required to use all due diligence in discovering whether there is a possible cause of action; mere ignorance of a cause of action is not enough to stay the statute of limitations. *Spevack v. United States, supra*, 390 F.2d at 981, 182 Ct.Cl. at 889–90; *Japanese War Notes Claimants Ass'n, supra*, 373 F.2d at 358–59, 178 Ct.Cl. at 634. Here, however, the plaintiff, her attorneys, and others have made repeated efforts to discover the truth of the matter behind her discharge. Defendant cannot with any face come into this court and say the plaintiff is barred because she should have disbelieved defendant's own representations. *Glus v. Brooklyn Eastern District Terminal, supra.*

The reason for having the statute of limitations begin to run as soon as a plaintiff has notice of a potential cause of action is to protect a defendant's interest against tardy prosecution of claims as soon as the plaintiff is in a position to litigate his claim. The implicit assumption of course is that a diligent plaintiff can effectively prosecute a claim as soon as he has notice; this rationale loses much of its appeal when a plaintiff is confronted with the problem of litigating against a governmental organization which has as one of its primary purposes the preservation of secrecy and the power to obstruct any attempt by a plaintiff to investigate a potential claim.

In a recent order, *General Aircraft Corp. v. United States*, Ct.Cl. No. 544–77 (entered April 27, 1978), we were confronted with an analogous statute of limitations situation; the plaintiff claimed that it was excluded from world markets by the activities of the Central Intelligence Agency (CIA) and its proprietary corporations. The defendant urged that that plaintiff had had notice of potential claims for more than 10 years prior to the filing of its petition. It had hired counsel who made a complaint. The plaintiff argued that although it had information in 1967 indicating that the CIA was interfering with its corporate property, it was not until 1975 that the plaintiff was able to know the substantial nature and scope of the CIA's interference with the plaintiff's corporate property; only when the CIA made voluntary disclosures to Congress of its covert activities did the plaintiff have any reasonable basis for believing that it had a cause of action. The court remanded the case to the trial division for further proceedings on both the statute of limitations issue and the merits, since the two problems were so intertwined. This order cannot be reconciled with the majority's position in this case.

In conclusion, it cannot be said on the basis of the record before us that plaintiff was on such notice that she was obliged to file suit. We are not told, and should not ask, why the counsel she retained, along with the ACLU, did not recommend filing suit, but it would not be too much to suppose, on the basis of the exhibits before us, that they may have felt there was no justification for filing suit, because no valid money claim was asserted. They may have believed the repeated assurances given plaintiff by apparently upright people. Plaintiff indeed did believe that she had been blacklisted; however, it would also appear that each time she encountered something that tended to substantiate the existence of a cause of action, she acted diligently by retaining counsel or by obtaining the assistance of others in an effort to determine whether she had been so blacklisted. In any event, the blacklisting did not point to an illegal firing. It would ill comport with the general policies which operate to stay the operation of statutes of limitations to say that the statute has run because the defendant has been so successful in covering its tracks that the plaintiff, notwithstanding her suspicions and her diligent efforts to determine the truth, was not in a position to file a suit justifiably. The panel surely does not want to invite into this court persons entertaining only a vague sense of injustice, simply to protect causes of action they may in future discover. The

panel should be aware we have enough unfounded lawsuits in this court already. Plaintiff's various counsel are to be commended for not suing before they were put on notice as to the possible existence of facts that would support a money claim.

We should remand the case to the trial division as we did in the *General Aircraft Corp.* case; there is a clear question of fact whether the plaintiff, under the circumstances, was on such notice that she should have filed suit and whether she was justified in the face of a government conspiracy to conceal the cause of action in not attempting to file suit, notwithstanding the ability of a plaintiff to file at this court a petition pending motion for discovery under Rule 36 and concomitant discovery procedures. Both the statute of limitations issue and the merits of the case should be tried together, since they are so closely related.

One final word: there appear in plaintiff's falsification charges the names of various persons once well known to me and I suppose to other members of this court. Such persons are entitled to the usual presumption of good faith. They may well have acted on a misguided view of security requirements. I would not, myself, readily charge them with personal fraud and plaintiff's case does not require us to suppose any, for the concealment need not have been fraudulent. Plaintiff dealt with an institution, the U.S. Government, one where, in any administration, no one gets to sign the letters he writes, or to write the letters he signs. Persons who function in the latter category have to depend on subordinates for their facts. As between "Chiefs" and "Indians" the sophisticated influence seeker often cultivates the latter as holding the greater power. The late Senator Joe McCarthy gave his name, not without reason, to the era in which Ms. Braude lost her job, but many nameless executive branch supporters made his rise possible, and many were burrowed deep in the bureaucracy after he was gone. The institution remained incapable of spontaneously curing all its security-related wrongs, and some of the brightest and the best may have unwittingly lent their names in the way none other than Dean Acheson figures in *Service v. Dulles, supra.* We have to pass only on what the institution did respecting Ms. Braude.