# United States Court of Appeals for the Federal Circuit

2008-5085

ROBERT INGRUM,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Ryan G. Anderson, McClenahan Anderson & Stryker, P.L.L.C., of San Antonio, Texas, argued for plaintiff-appellant.

Robert P. Stockman, Trial Attorney, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were Ronald J. Tenpas, Assistant Attorney General, Kathryn C. Kovacs and Robert H. Oakley, Attorneys.

Appealed from: United States Court of Federal Claims

Judge Mary Ellen Coster Williams

# United States Court of Appeals for the Federal Circuit

2008-5085

ROBERT INGRUM,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims
in 07-CV-012, Judge Mary Ellen Coster Williams.

_____

DECIDED:  March 25, 2009
_____

Before RADER, BRYSON, and MOORE, <u>Circuit Judges.</u>

BRYSON, <u>Circuit Judge</u>.

Robert Ingrum filed an action seeking just compensation for the government's removal of fill material from a hillside on his property.  The Court of Federal Claims dismissed the action as time-barred under the applicable six-year statute of limitations.  We affirm.

I

On March 16, 1999, Mr. Ingrum purchased approximately 3,300 acres of undeveloped land along the Mexican border near the small town of Candelaria, Texas.  He paid $98,000 for the property.  An unpaved road, known as "the River Road,"

provides the only vehicular access to the property. The paved highway that connects with the River Road ends in Candelaria, about four miles from the edge of Mr. Ingrum's property. The River Road crosses his property for about 2.75 miles and then continues northward along the Rio Grande. The property can be accessed by road from both the north and the south, although access from the north involves traversing a much longer stretch of unimproved road.

In 1997, heavy rainfall eroded a portion of the River Road south of the property. A task force from the Department of Defense built a bypass around the washed-out stretch of road and made additional improvements to the road. Those repairs were completed in 1998, prior to Mr. Ingrum's purchase of the property. To perform those repairs, the task force used fill material that it had excavated, with the permission of the previous landowner, from the side of a hill near a gravel pit on the property. Rainfall during the summer of 1998 again washed out portions of the road, including some of the roadwork that was completed earlier that year. The task force therefore returned to perform additional repairs. Before the government performed those repairs, Mr. Ingrum signed a "Right of Entry" permit authorizing the government to enter the property to repair the road and to carry out military training and other operations on the land. Mr. Ingrum signed that permit on March 13, 1999, shortly before closing on the property. The Right of Entry permit also contained a provision that stated: "The Owner (does/does not) grant the Government the right to use any buildings, timber or any other products of the land." Mr. Ingrum did not select either the "does" or "does not" option when executing the permit; instead, that portion of the form was left blank.

From March through April 1999, the government repaired the road by regrading it in some places, installing concrete culverts, and laying concrete slabs in flood-prone areas. To conduct those repairs, the government again excavated fill material from the same hillside borrow pit on Mr. Ingrum's property. The removal of the fill material left a "bowl-like formation" on the hillside that was plainly visible from the portion of the River Road that crossed the property. Mr. Ingrum estimated that the excavated area was roughly 200 feet across.

Prior to purchasing the property, Mr. Ingrum had accessed it from the south on numerous occasions. Approaching from that direction, the trip to the property was a 12-hour drive from Mr. Ingrum's residence in Austin, Texas. Although Mr. Ingrum attempted to make that drive several times after the government completed its repairs of the road in April 1999, he was unable to drive onto the property on those occasions because flooding had rendered portions of the River Road south of the property impassable. Mr. Ingrum was aware that the River Road was passable from the north, but he chose not to access his property from that direction because doing so "would have required an additional 7-9 hours of driving" along rough, unpaved roads, which he regarded as "an untenable option."

Several times between 1999 and 2004, Mr. Ingrum spoke by telephone with a Border Patrol agent in order to determine the condition of the River Road; the agent reported on several occasions that the road was passable from the south. Mr. Ingrum did not attempt to access his property on those occasions, however, because those were all times when it was not convenient for him to make the drive.

Because Mr. Ingrum did not visit his property between April 1999 and 2005, he did not learn about the hillside borrow pit until he happened to encounter a migrant worker in Candelaria in May 2004. The worker, who had crossed Mr. Ingrum's property in order to gain access to the Rio Grande, told Mr. Ingrum about the pit and commented that the government construction workers "took a lot of material" from the hillside. Some eight or nine months later, Mr. Ingrum visited his property and saw the borrow pit for the first time.

On August 2, 2006, another 18 months after seeing the borrow pit, Mr. Ingrum filed a takings claim against the United States in the Court of Federal Claims. He sought $324,000 in compensation for the taking of the fill material that was used for the 1999 road repairs. Although that figure was more than three times the price that Mr. Ingrum had paid for the entire 3300-acre property in 1999, Mr. Ingrum justified the amount as an estimate of what it would have cost the government to purchase and transport from the nearest gravel pit enough material to rebuild seven miles of road. After dismissing his suit voluntarily to cure an unrelated jurisdictional defect, Mr. Ingrum filed another complaint in the Court of Federal Claims on January 9, 2007.

The government sought dismissal of the action as time-barred under the six-year statute of limitations for actions falling within the jurisdiction of the Court of Federal Claims. Mr. Ingrum argued that his claim did not accrue at the time the fill material was taken in March and April 1999, because he was unaware of the taking and had no reason to be aware of it until he learned about the borrow pit in May 2004. He contended that he was not chargeable with knowledge of the taking because he lived far from the property, he had been unable to access the property from the south on

several occasions because of poor road conditions, and the Right of Entry permit had not given him notice that the government intended to take material from his land. For those reasons, he argued that his takings claim accrued only when he first learned of the alleged taking in 2004. Accordingly, he contended that his suit, which was filed in 2006, was filed within the six-year limitations period.

The Court of Federal Claims ruled that because the actions giving rise to the takings claim were not inherently unknowable, Mr. Ingrum's claim accrued in April 1999 when the government completed its repair work. Ingrum v. United States, 81 Fed. Cl. 661 (2008). Accordingly, the court dismissed Mr. Ingrum's action as time-barred under the applicable statute of limitations. Mr. Ingrum now appeals to this court.

II

A claim falling within the jurisdiction of the Court of Federal Claims must be brought within six years of the date that the cause of action accrued. 28 U.S.C. § 2501. A claim first accrues when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action. Therefore, a claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs. Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994).

The parties in this case agree that the alleged taking occurred no later than April 1999, when the government task force removed the fill material from the hillside on Mr. Ingrum's property. That accrual date would place Mr. Ingrum's suit, which he first filed on August 2, 2006, outside the six-year limitations period. Mr. Ingrum therefore seeks the benefit of the "accrual suspension" rule. Under that rule, the accrual of a claim

against the United States will in some situations be suspended when an accrual date has been ascertained, but the plaintiff does not know of the claim. Japanese War Notes Claimants Ass'n v. United States, 373 F.2d 356, 358-59 (Ct. Cl. 1967). However, a plaintiff's ignorance of a claim that he should have been aware of is not enough to suspend the accrual of a claim. Id. at 359; see Braude v. United States, 218 Ct. Cl. 270, 274 (1978). The accrual suspension rule is "strictly and narrowly applied," and the accrual date of a cause of action will be suspended in only two circumstances: "[the plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable'" at the time the cause of action accrued. Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc), quoting Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985); Alliance of Descendants of Tex. Land Grants, 37 F.3d at 1482; Catawba Indian Tribe v. United States, 982 F.2d 1564, 1571-72 (Fed. Cir. 1993); Japanese War Notes Claimants Ass'n, 373 F.2d at 359.[1]

Mr. Ingrum does not contend that the government concealed its actions. His sole argument is that his action is not time-barred because the alleged taking was inherently unknowable as of the accrual date. We conclude that the facts underlying Mr. Ingrum's

---

[1]    It is sometimes stated that accrual of a claim against the United States will be suspended until the claimant "knew or should have known" that the claim existed. See Kinsey v. United States, 852 F.2d 556, 557 n.* (Fed. Cir. 1988). That articulation of the rule is not meant to set forth a different test, as the two standards have been used interchangeably. See Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). However, the "concealed or inherently unknowable" formulation, which the trial court used in this case, is both more common and more precise, and we therefore continue to endorse that formulation as the preferable one for "accrual suspension" cases. See Martinez v. United States, 333 F.3d at 1319.

claim were not inherently unknowable because the government's excavation of the fill material was an open and notorious activity conducted on his property, and because Mr. Ingrum was on notice of the government's repair activities and of the possibility that the government would use fill from his property in the course of those activities.

The line of "accrual suspension" cases dealing with takings claims has established that "[w]here the actions of the government are open and notorious . . . [the] plaintiff is on inquiry as to its possible injury," and the statute of limitations begins to run. Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864, 867 (1981). In Coastal Petroleum, the plaintiff sought just compensation more than six years after the government used, and prevented access to, the plaintiff's limestone in order to construct a canal in Florida. Because the canal project was widely reported in the state news media, and because the plaintiff had admitted that it was aware of the project, the court concluded that the government's actions were open and notorious and that the plaintiff was therefore "on inquiry as to the threat to its property rights." Id.

The Court of Federal Claims applied the same principle in Catellus Development Corp. v. United States, 31 Fed. Cl. 399 (1994), in which a landowner brought a takings claim against the government for mistakenly shelling his remote property during artillery exercises and allegedly contaminating his land with unexploded ordnance. The court concluded that the bombing exercises were open and notorious acts that placed the landowner on inquiry that it had a possible claim, thus triggering the limitations period. Id. at 408 n.8; see also Voisin v. United States, 80 Fed. Cl. 164, 176 (2008) (construction of houses on disputed property was "clearly an open and notorious activity" putting plaintiffs on notice of the government's actions); Jakoby v. United

States, 38 Fed. Cl. 192, 195 (1997) (absence of roadway or passage to plaintiff's property was "open and notorious" condition precluding tolling of limitations period); LaFont v. United States, 17 Cl. Ct. 837, 842 (1989) (government dredging operation that allegedly damaged plaintiff's oyster beds was "an obvious act" that set the accrual date for plaintiff's takings claim); cf. Dahl v. United States, 319 F.3d 1226, 1229 (10th Cir. 2003) (accrual of Federal Tort Claims Act claim not suspended under "discovery rule" because destruction of 30-foot high stockpile of mineral ore was a "manifest injury" that would have been obvious upon inspection).[2]

These authorities stand for the principle, which we reaffirm, that a landowner will be deemed to be on inquiry of activities that are openly conducted on his property. Applying that principle to this case, it is apparent that the government's use of the fill material from Mr. Ingrum's property was an open and notorious act that put him on inquiry that he had a potential claim. By Mr. Ingrum's own estimation, the borrow pit created by the government's use of the fill material had a footprint of roughly 35,000 square feet. Mr. Ingrum concedes that if he had visited his property after the government performed the 1999 repairs, he would have discovered the pit because it was "in plain sight" and clearly visible from the road. Under those circumstances, the government's actions cannot fairly be described as inherently unknowable.

---

[2] The concept of an "open and notorious" condition has been applied most frequently in the law of adverse possession, where it plays a similar role. See William B. Stoebuck & Dale A. Whitman, The Law of Property 856 (2000) ("'Open and notorious' possession usually means possession that gives visible evidence to one on the surface of the possessed land. The purpose of this element is to afford the owner opportunity for notice. He need not actually have seen the evidence, but is charged with seeing what reasonable inspection would disclose.").

Furthermore, like the plaintiff in <u>Coastal Petroleum</u>, Mr. Ingrum was aware of the construction on his property.  Indeed, Mr. Ingrum signed the Right of Entry permit explicitly authorizing the government task force to enter his property in order to reconstruct portions of the River Road on and near that property.  Because Mr. Ingrum knew of the construction activities, he was on inquiry that he had a potential takings claim.  <u>See</u> <u>Coastal Petroleum</u>, 228 Ct. Cl. at 867; <u>see also</u> <u>Fallini v. United States</u>, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("[A] plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue.").

Mr. Ingrum argues that although the Right of Entry permit provided notice of the government's construction activities on his land, it did not give him any reason to suspect that the government would use fill material from his property in the course of those activities.  In support of that contention, Mr. Ingrum relies on the fact that the Right of Entry permit included a provision that would have expressly authorized the government to use "buildings, timber or any other products of the land," yet he did not indicate on the permit whether he "does" or "does not" so authorize the government.  Thus, Mr. Ingrum argues, it was reasonable for him to assume that the government would not take any material from his property.

In fact, the provision in the Right of Entry permit addressing the government's authorization to use products from the land cuts the other way:  Its very presence put Mr. Ingrum on notice that the government contemplated that the repairs would necessitate the use of material from Mr. Ingrum's property, regardless of whether he affirmatively granted that permission.  The question whether Mr. Ingrum granted the government permission to use material from his property goes to the merits of his

takings claim; it does not negate the fact that the authorization provision put Mr. Ingrum on notice that the government might need to use fill material from the property. Although Mr. Ingrum could not be sure that the government would do so (and may have hoped that it would not), he clearly knew enough at the time the government completed its repairs to make an inquiry and discover the facts underlying his takings claim. See Menominee Tribe of Indians v. United States, 726 F.2d 718, 721 (Fed. Cir. 1984). Having failed to make such an inquiry, Mr. Ingrum cannot now avail himself of the accrual suspension rule.

Finally, Mr. Ingrum argues that it would be unreasonable to expect him to have discovered the government's alleged taking any earlier. He notes that his property is located several hundred miles from his residence in Austin; that he tried to access his property via the southern route several times, but was thwarted by poor road conditions; that the occasions on which he knew that the River Road was passable from the south were all times that were inconvenient for him to visit; and that it would have taken an additional 7-9 hours of driving on rough terrain to access his property from the north. We are not persuaded that those circumstances satisfy the strict standard of showing that the government's action was "inherently unknowable." As discussed above, a landowner is on inquiry as to open and notorious activities conducted on his property. That principle applies regardless of how far the landowner resides from the disputed property. Thus, it is immaterial whether Mr. Ingrum lived in Austin or New York City, as opposed to some closer location such as Candelaria, or that it would have taken him longer to access his property via the passable northern route. "It is fair to charge a property owner with knowledge of what happens on his land," so long as those activities

are open and notorious.  See Catellus, 31 Fed. Cl. at 408; see also Entines v. United States, 39 Fed. Cl. 673, 680 (1997) ("It is important to remember that tolling is not appropriate for claims that are simply burdensome or inconvenient to discover.").  As the trial court correctly observed in this case, "A property owner is charged with knowledge of what happens on his property even if the land is remote and difficult to access."  81 Fed. Cl. at 667.  Because we agree with the trial court that Mr. Ingrum's claim was not inherently unknowable when the alleged taking occurred in April 1999, we uphold the court's decision dismissing his claim as time-barred.

AFFIRMED.