# In the United States Court of Federal Claims

Nos. 09-844C & No. 10-741C (consolidated)

(Filed Under Seal: March 22, 2013)
(Reissued: March 27, 2013)

| | | |
|---|---|---|
| ************************************* | | Post-trial decision on government's |
| | ) | claim for damages based upon alleged |
| **SIKORSKY AIRCRAFT CORPORATION,** | ) | misallocation of indirect costs to |
| | ) | government contracts; statute of |
| **Plaintiff,** | ) | limitations; 41 U.S.C. § 7103(a)(4)(A); |
| | ) | Cost Accounting Standards; scope and |
| **v.** | ) | thrust of 48 C.F.R. § 9904.418–50; |
| | ) | criteria for proper cost-accounting |
| **UNITED STATES,** | ) | allocation of indirect costs; significance |
| | ) | of costs of management and supervision |
| **Defendant.** | ) | of activities related to direct labor or |
| | ) | materiel costs; applicability of 48 |
| ************************************* | | C.F.R. § 9904.418–50(e); proper use of |
| | | a surrogate to allocate indirect materiel |
| | | costs |

Jeffrey A. Hall, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, Illinois, for plaintiff. Of counsel were Shayna S. Cook, Allison W. Freedman, Georgia N. Alexakis, and Katherine M. Swift, Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL; Karen L. Manos, Gibson, Dunn & Crutcher LLP, Washington, D.C.; and Ariel R. David, Sikorsky Aircraft Corporation, Stratford, CT.

James W. Poirier, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Of counsel were Stuart F. Delery, Principal Deputy Assistant Attorney General, Civil Division, Jeanne A. Davidson, Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Kathleen Malone, Defense Contract Management Agency, Boston, MA.

## OPINION AND ORDER[1]

LETTOW, Judge.

---

[1]Because this opinion might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information. The resulting redactions are indicated by brackets enclosing asterisks, *e.g.*, "[***]." Several minor changes to citations have also been made.

This post-trial decision concerns the allocation of indirect costs to contracts under which Sikorsky Aircraft Corporation ("Sikorsky") provided aircraft and spare parts to the United States Government ("government"). The government claims that Sikorsky should reimburse it approximately $80 million plus interest because Sikorsky's accounting method misallocated indirect costs to the company's contracts with the government in contravention of the Cost Accounting Standards ("CAS") set out at 48 C.F.R. Chapter 99, Subchapter B, Part 9904. Sikorsky avers that its accounting practices were compliant with the CAS, and alternatively relies upon the affirmative defenses that the government's claim is barred by the six-year statute of limitations set forth in the Contract Disputes Act ("CDA"), *see* 41 U.S.C. § 7103(a)(4)(A), and that the parties reached an accord and satisfaction late in 2005 that resolved all their outstanding issues.[2]

The court held a five-day trial on the CAS-compliance and statute-of-limitations issues in October 2012. Post-trial briefing was then provided, and on January 25, 2013, the parties presented their closing arguments. The case is accordingly ready for disposition.[3]

## FACTS[4]

The parties addressed two issues at the October trial: the applicability of 48 C.F.R. § 9904.418 ("CAS 418"), particularly the standards for allocation of direct and indirect costs codified at Sections 9904.418–20 to 9904.418–63, and the pertinence of the six-year statute of limitations in the CDA requiring "each claim by the [f]ederal [g]overnment against a contractor relating to a contract [to] be submitted within 6 years after the accrual of the claim." 41 U.S.C.

---

[2]This opinion and order does not address Sikorsky's second affirmative defense based on an accord and satisfaction that arguably occurred in late 2005 when the government's administrative contracting officer and a Sikorsky representative allegedly agreed to consider the CAS 418 noncompliance resolved in exchange for Sikorsky's decision to alter its accounting practice going forward. *See* Compl. in No. 09-844 ¶¶ 45-50; *Sikorsky Aircraft Corp. v. United States*, 105 Fed. Cl. 657, 674 (2012) ("*Sikorsky II*"). The court denied the government's motion for summary judgment on this affirmative defense after a lengthy examination, *see Sikorsky II*, 105 Fed. Cl. at 674-78, noting that there "is a genuine dispute as to the parties' understanding of the purported agreement between [the parties' representatives]," *id.* at 678. Although the accord-and-satisfaction issue was not tried with the CAS-applicability and statute-of-limitations issues, it has not been waived and remains a potentially viable affirmative defense. As this opinion indicates, however, resolution of these two consolidated cases is possible without reaching the accord-and-satisfaction defense.

[3]Sikorsky filed a third, separate action, docketed as 12-898C, in this court on December 20, 2012 regarding a follow-on claim made by the government on December 21, 2011. *See* Compl. in No. 12-898C, ¶¶ 1-7.

[4]This recitation of facts constitutes the court's principal findings of fact in accord with RCFC 52(a). Other findings of fact and rulings on mixed questions of fact and law are set out in the analysis.

§ 7103(a)(4)(A). The relevant statutory and regulatory framework for these issues was canvassed in several prior opinions of the court in these cases, *see Sikorsky Aircraft Corp. v. United States*, 102 Fed. Cl. 38 (2011) ("*Sikorsky I*");[5] *Sikorsky II*, 105 Fed. Cl. 657; *Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571 (2012) ("*Sikorsky III*"), and that framework, as an initial matter, will be described briefly to provide a context for the factual findings that follow.

### A. *Statutory and Regulatory Framework*

The CAS are a set of nineteen cost-accounting criteria[6] promulgated by the Cost Accounting Standards Board ("CASB"), a five-member entity that has "exclusive authority to prescribe, amend, and rescind cost accounting standards, and interpretations of the standards, [which govern] measurement, assignment, and allocation of costs to contracts with the [f]ederal [g]overnment." *Sikorsky I*, 102 Fed. Cl. at 41 (citing 41 U.S.C. § 1502; 48 C.F.R. §§ 9900.000 to 9904.420–63; Darrell J. Oyer, *Accounting for Government Contracts — Cost Accounting Standards*, § 1.01 to .05 (2010)). This case centers on CAS 418, which governs government contractors' distribution of indirect costs among their contracts.[7] CAS 418 specifies accounting practices for "consistent determination of direct and indirect costs," "the accumulation of indirect costs . . . in indirect cost pools," and "the selection of allocation measures based on the beneficial or causal relationship between an indirect cost pool and cost objectives." 48 C.F.R. § 9904.418– 20. A direct cost is "any cost which is identified specifically with a particular final cost objective[, *e.g.*, a contract]. . . . Costs identified specifically with a contract are direct costs of that contract." 48 C.F.R. § 9904.418–30(a)(2). An indirect cost is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives

---

[5]Sikorsky first brought suit in this court on December 8, 2009, seeking a judgment declaring that the contracting officer's final decision requiring the company to pay $80 million plus interest was null and of no effect, and that Sikorsky's challenged allocation method complied with CAS 418. *See Sikorsky I*, 102 Fed. Cl. at 40. It also pleaded statute- of-limitations and accord-and-satisfaction affirmative defenses. In light of the Federal Circuit's decision in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010), Sikorsky thereafter submitted a claim to a contracting officer seeking a decision regarding the merits of those affirmative defenses. *Id.* When the contracting officer rejected the claim respecting defenses, Sikorsky brought a second suit seeking review of the denial. The court consolidated the two cases on Nov. 19, 2010, *see* ECF No. 26, and thereafter denied the government's motion to dismiss the second case. *See Sikorsky I*, 102 Fed. Cl. at 47-48 & n.14 (distinguishing *Maropakis*).

[6]The nineteen standards are collected at 48 C.F.R. §§ 9904.401 to 9904.420 (CAS 419 does not exist).

[7]The CASB, which was established by Congress in 1970, undertook numerous proceedings and considered several drafts of, and proposals for, CAS 418 before settling on the current text of the regulation in 1980. For a more detailed recounting of the published regulatory history concerning CAS 418, see *Sikorsky I*, 102 Fed. Cl. at 56-58.

or with at least one intermediate cost objective." *Id.* § 9904.418–30(a)(3).[8]  Indirect costs are grouped together in "indirect pools."  *Id.* § 9904.418–40(b).  Both direct and indirect costs are allocated to cost objectives.[9]  Indirect costs are to be apportioned according to an allocation method (also termed an allocation base, allocation basis, or cost driver), which guides how an indirect cost is to be distributed among multiple cost objectives.

Section 418–50 provides a framework for acceptable allocation methods.  It first provides two definitions of "homogenous indirect cost pools": (1) pools where "each significant activity whose costs are included therein has the same or a similar beneficial or causal relationship to cost objectives as the other activities whose costs are included in the cost pool;" or (2) pools where "the allocation of the costs of the activities included in the cost pool result in an allocation to cost objectives which is not materially different from the allocation that would result if the costs of the activities were allocated separately.  48 C.F.R. § 9904.418–50(b).[10]  These

---

[8]"*Cost objective*" is defined as "a function, organizational subdivision, contract[,] or other work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capitalized projects, etc." 48 C.F.R. § 9904.410–30(a)(4).  In turn, "*[f]inal cost objective* means a cost objective which has allocated to it both direct and indirect costs, and, in the contractor's accumulation systems, is one of the final accumulation points."  *Id.* § 9904.410–30(a)(5).  These definitions apply to CAS 418.  *See id.* § 9904.418–30(a), (b).

   An "intermediate cost objective" is not defined in Part 9904, but a definition is supplied in 48 C.F.R. Chapter 99, Part 9905, which establishes CASB's cost accounting standards for educational institutions.  The definition in Part 9905 specifies that *"[i]ntermediate cost objective* means a cost objective that is used to accumulate indirect costs or service center costs that are subsequently allocated to one or more indirect cost pools and/or final cost objectives."  48 C.F.R. § 9905.502-30(a)(7).  Although the definition of "intermediate cost objective" was the subject of some dispute at trial, *see*, *e.g.*, Tr. 512:16 to 513:7 (Test. of Joseph Chancio, Sikorsky's former Assistant Controller, Government Accounting); Tr. 697:7 to 701:10 (Test. of Joan Sherwood, Contract Specialist, Defense Contract Management Agency ("DCMA"), previously the Corporate Administrative Contracting Officer ("CACO") for the government at Sikorsky); *see also* H'rg Tr. 65:12 to 68:16 (Closing Arg. (Jan. 25, 2013)), the definition in Part 9905 applies to CAS 418, *see* § 9904.418-30(a) ("Other terms defined elsewhere in this chapter 99 shall have the meanings ascribed to them in those definitions unless [subsection] (b) of this []section [] requires otherwise.").  No pertinent exceptions or modifications are stated in Subsection 9904.418–30(b), so the definition of "intermediate cost objective" in Part 9905 appertains to CAS 418.  Here, in context, the term arguably can be said to encompass indirect costs associated with production or development of a component, part, or function that contributes to the final contractual result.

[9]"*Allocate* means to assign an item of cost, or a group of items of cost, to one or more cost objectives. This term includes both direct assignment of cost and the reassignment of a share from an indirect cost pool."  48 C.F.R. § 9904.418–30(a)(1).

[10]In turn, "[t]he determination of materiality shall be made using the criteria provided in [48 C.F.R. §] 9903.305."  48 C.F.R. § 9904.418–50(b)(2).  That provision sets out six factors, of which "no one criterion is necessarily determinative."  48 C.F.R. § 9903.305.  Those factors

4

definitions are a prelude to Subsections 418–50(d) and (e), which set forth acceptable allocation methods for certain indirect cost pools.

Subsection 418–50(d) governs allocation measures for indirect cost pools that include a "material amount of the costs of management or supervision of activities involving direct labor or direct materi[e]l costs" and specifies that "[t]he costs of the management or supervision of activities involving direct labor or direct materi[e]l costs do *not* have a direct and definitive relationship to the benefiting cost objectives and *cannot* be allocated on measures of a specific beneficial or causal relationship." 48 C.F.R. § 9904.418–50(d)(1) (emphasis added).[11] Thus, "the base selected to measure the allocation of the pooled costs to cost objectives" for indirect cost pools that include a material amount of the costs of management or supervision of activities involving direct labor or direct materiel costs "shall be a base *representative* of the activity being managed or supervised." *Id*. (emphasis added). By contrast, Subsection 418–50(e) governs pools that do not include significant costs of such management or supervision, and it specifies that these pools, by definition, are homogeneous and do "have a direct and definitive relationship between the activities in the pool and benefiting cost objectives." *Id.* § 9904. 418–50(e). In short, the allocation methods for indirect cost pools which *do not* include significant amounts of the costs of management or supervision of activities involving direct labor or direct materiel costs are dictated by Subsection 418–50(e). The allocation methods for pools that *do* contain significant amounts of the costs of management or supervision of activities involving direct labor or direct materiel costs are governed by Subsection 418–50(d). *See Sikorsky I*, 102 Fed. Cl. at 58.[12]

### B. *Sikorsky's 1999 Accounting Change, Audit, and Review*

In the course of Sikorsky's manufacture and overhaul of aircraft, Sikorsky allocates materiel overhead costs to contracts with the government and commercial customers. *See* JX 11-

---

include "[t]he absolute dollar amount involved," *id*. § 9903.305(a), and "[t]he amount of contract cost compared with the amount under consideration," *id*. § 9903.305(b).

[11]As noted in *Sikorsky I*, 102 Fed. Cl. at 43 n.7, the text of the subsections of Section 9904.418–50 can be confusing at first reading because the word "material" is used in two distinctly different ways. In the first usage in each of the subsections, "material" is an adjective meaning significant, and in the second usage, "material" refers to a component or supplied item, and is equivalent to the noun "materiel." For the sake of clarity, each subsequent use of "material" as a noun in this opinion will refer to "materiel."

[12]"[P]ools containing significant costs of management over 'activities involving only indirect costs' are not governed by either Subsection 418–50(d) or (e), because '[a] base representative of the activity being managed or supervised[, *i.e*., one of the bases set out in Subsection 418–50(d),] is not suitable.' Instead, these pools are governed by CAS 410." *Sikorsky I*, 102 Fed. Cl. at 58 (quoting Allocation of Direct and Indirect Costs; Cost Accounting Standard, 45 Fed. Reg. 31,929, pmbl. at 31,931 (May 15, 1980) ("CAS 418 Preamble") and citing 48 C.F.R. § 9904.410–30(a)(6)).

14 to -15 (2004 Defense Contract Audit Agency ("DCAA") Audit Report).[13]  Materiel overhead costs are considered "indirect" and include the costs of purchasing materiel used by Sikorsky to manufacture and assemble aircraft and spare parts,[14] storing the materiel in warehouses awaiting use, and supplying the materiel to the manufacturing labor force at assembly points.  *See* JX 2-16 to -17 (Sikorsky CASB Revised Disclosure Statement); Tr. 940:8 to 949:23 (Test. of Stephen A. Kopchick, Sikorsky's former Director, Manufacturing Services); Tr. 266:16 to 267:13 (Test. of Paul J. Trompetter, Sikorsky's Controller, U.S. Government Accounting/Compliance).[15]  Before 1999, Sikorsky, with the blessing of the government, used an accounting method that allocated materiel overhead costs using a hybrid allocation base: direct materiel costs minus the costs of commercial engines and used helicopters.  Tr. 493:21-24, 594:21-23, 608:16-18, 629:5-25 (Chancio).  Sikorsky employed this particular scheme in an effort to mitigate the distortive effects of government furnished materiel ("GFM").  Tr. 864:1-7 (Test. of Robert Boyer, DCAA's Technical Specialist (auditor), assigned at Sikorsky).  In Sikorsky's production of aircraft for the government, it installs components supplied by the government, which the government purchases from other manufacturers.  Sikorsky's only costs associated with GFM are materiel storage and handling expenses.  Tr. 271:10 to 272:8 (Trompetter); *see also* Tr. 682:9-16 (Sherwood).  GFM encompasses a wide range of components, including engines, the hovering infrared suppression system and auxiliary power units, crash seats, support equipment, and radios.  Tr. 271:6-19 (Trompetter); Tr. 682:13 to 683:3 (Sherwood); Tr. 859:15-20 (Boyer); *see also* PDX 302 (Depiction of UH-60 Black Hawk Helicopter GFM). The government does not allow Sikorsky to assign any accounting value to GFM, *see* Tr. 503:1-4 (Chancio); Tr. 866:6-11 (Boyer), although Sikorsky estimates the value of GFM it receives to be between $[***] million to $[***] million annually,  PX 63-2 to -6 (Government Furnished Equipment Receipts, 2001-2005); Tr. 285:1-24 (Trompetter).  Sikorsky's pre-1999 allocation base tried to ameliorate the

---

[13]The designation "PX __-__" refers to plaintiff's trial exhibits, "DX __-__" refers to defendant's trial exhibits, and "JX __ - __" refers to joint exhibits.  The number before the hyphen designates the particular exhibit being cited, and the number after the hyphen refers to a specific page of the exhibit.  "PDX __" and "DDX __" refer to plaintiff's and defendant's demonstrative exhibits, respectively.

[14]Purchasing activities include issuing requests for price quotations to suppliers, negotiating pricing, drafting purchase orders, and coordinating parts delivery schedules with suppliers.  Tr. 983:9 to 984:6 (Test. of Albert Altieri, Vice President and Chief Operating Officer, Sikorsky Aerospace Services).  In some cases, purchasing activities related to government contracts must be tailored to comply with certain government regulations, including the Federal Acquisition Regulations ("FAR") set out in Title 48 of the Code of Federal Regulations and the CAS.  Tr. 812:14 to 813:4, 813:23 to 814:7, 815:10-13 (Test. of John DeCesare, DCAA's Supervisory Auditor, Pratt & Whitney Resident Office); Tr. 986:6-10, 986:25 to 987:13 (Altieri).

[15]The latter two types of cost are captured under the umbrella term "materiel logistics" and include master scheduling, parts and requirements planning, receiving, internal transportation, trucking, traffic, warehousing, kitting, area control stations, and expediting.  Tr. 940:8-949:23 (Kopchick); *see also* Tr. 267:2-13 (Trompetter).

GFM distortion by also removing the cost of commercial engines from the calculus of materiel costs.

Still, Sikorsky officials felt that the pre-1999 compromise was not entirely effective because the company used substantial amounts of GFM beyond engines, and the removal of the cost of commercial engines from the base did not "deal with the remaining GF[M] that [Sikorsky] still [had] in [its] factory that [was] still being handled and moved around and not receiving any allocations." Tr. 510:19 to 511:2 (Chancio). Effective January 1, 1999, Sikorsky changed its accounting practices to better address the perceived distortion and, among other things, began allocating indirect materiel costs using a direct labor cost base. *See* JX 4-3 (1999 Final Audit Report); *see also* Tr. 501:1-5 (Chancio); Tr. 867:1-8 (Boyer). Sikorsky notified the government of these accounting changes before they took effect, submitting a revised cost-accounting Disclosure Statement to Ms. Sherwood, then its CACO, on August 12, 1998. JX 2-2 (Sikorsky CASB Revised Disclosure Statement). Government officials, including the CACO, Ms. Sherwood, [16] and DCAA's auditor, Robert Boyer, met on February 4, 1999 to discuss the cost effects of these changes, in particular the adoption of a method that allocated materiel indirect costs using a direct labor base. PX 13 (Handwritten Meeting Notes of Robert Boyer); Tr. 885:17-24 (Boyer); *see also* Tr. 822:10-11 (Boyer). According to Mr. Boyer's handwritten meeting notes, the cost impact of the accounting change appeared to be $11.8 million in 2001 and $54.1 million in 2008, and the total cost impact from 1999 to 2003 appeared to be $140 million in increased costs for the government, "mostly due to" the accounting change regarding indirect materiel costs. PX 13-3 (Handwritten Meeting Notes of Robert Boyer); Tr. 887:22 to 888:1 (Boyer). Mr. Boyer also noted that he showed these figures to Ms. Sherwood at the meeting. *See* PX 13-3 (Handwritten Meeting Notes of Robert Boyer); Tr. 887:9-21 (Boyer).

On April 22, 1999, DCAA submitted to Sikorsky a draft audit of the company's revised Disclosure Statement. JX 3-1 to -3 (1999 Draft Audit Report). The draft audit, authored by Mr. Boyer, Tr. 874:7-11 (Boyer), would have concluded that Sikorsky's revised accounting practice was "in noncompliance with CAS 418," JX 3-4 (1999 Draft Audit Report), resulting in increased costs to the government of approximately $8 million in 2001 and $30 million in 2008, JX 3-10 (1999 Draft Audit Report); Tr. 876:16 to 877:10 (Boyer). In the draft audit, Mr. Boyer also took the position that the materiel overhead pool included "significant costs of management and supervision of activities involving direct materiel costs." JX 3-7 (1999 Draft Audit Report); Tr. 875:1-18 (Boyer). In making this determination, Mr. Boyer treated all purchasing activity as a cost of management and supervision of activities involving direct materiel costs. JX 3-7 (1999 Draft Audit Report); Tr. 875:19 to 876:15 (Boyer).[17] He also believed that Sikorsky could avoid

---

[16]As noted previously, *see supra*, n.8, Ms. Sherwood was the CACO who served as the government's contracting officer for accounting purposes at Sikorsky. The FAR and the parties refer to this same responsible government officer as, variously, the CACO, the Divisional Administrative Contracting Officer ("DACO"), the Administrative Contracting Officer ("ACO"), and the Cognizant Federal Agency Official ("CFAO").

[17]In Mr. Boyer's view, the purchasing activity constituted approximately 54 percent of the materiel operations in direct salaries and wages and related occupancy costs. Tr. 875:19-23 (Boyer).

GFM distortion and remain compliant with CAS 418 by using an accounting practice that included two materiel overhead pools, one of which contained all of the materiel overhead costs incurred in connection with GFM.  Tr. 924:5-21 (Boyer); *see also* JX 3-5 (1999 Draft Audit Report).

Sikorsky responded to the draft audit two months later, writing that its accounting change would have resulted in an increased cost to the government of about $1.7 million in 1998 and that it would reassess the accounting change during the latter part of 1999 to determine the extent of the accounting changes' effect on future years.  JX 4-9 (reproducing letter from Frank Errato, then Sikorsky's Vice President, Compliance and Government Accounting, to Anthony J. O'Falt, DCAA (June 28, 1999)); Tr. 722:4-19 (Sherwood).  DCAA then issued its final audit on July 22, 1999.  The audit concluded:

> Our audit procedures disclosed no instances [of] noncompliance with CAS 418.  However, instances of noncompliance not detected during this audit may be discovered during our continuous audit of the contractor's cost accounting practices.
>
> This opinion is primarily based on the fact that there is no material impact on CAS covered contracts for CY[, i.e., calendar year] 1999 due to the [accounting] change. . . .
>
> . . . DCAA and the contractor have agreed to reassess the impact of this change on future years during the last half of CY 1999.  The future production of RAH-66 Commanche [sic] and S-92 helicopters coupled with Sikorsky's announced and unannounced restructuring plans may alter our opinion regarding the present immateriality of this change on CAS covered contracts.
>
> We accordingly recommend that you [Ms. Sherwood] notify Sikorsky that our opinion regarding its compliance with CAS 418 is based on the fact that its above-described cost accounting change does not at this time result in a material impact on CAS covered contracts.  Further, should there be a shift due to the type or mix of future business or restructuring, we reserve the right to reopen this issue.

JX 4-4 (1999 Final Audit Report).  Accordingly, Ms. Sherwood determined that the revised Disclosure Statement was "both adequate and compliant with the caveat that a condition that could result in a potentially material CAS 418 noncompliance will be continually monitored and may require redress in the future."  JX 4-1 (1999 Final Audit Report).  Ms. Sherwood also requested that Sikorsky submit a cost-impact proposal within 60 days of receipt of the final audit.  *Id.*  Sikorsky did so on February 3, 2000, reporting a net benefit to the government of $2.35 million through 2003.  JX 5 (February 2000 Cost Impact Proposal).[18]  Sikorsky revised this

---

[18]A change that increases the amount of costs that are allocated to the contractor's fixed-price, CAS-covered contracts is considered to be a decreased cost to the government.  *See* Tr. 732:6-10 (Sherwood).  When costs allocated to such a fixed-price contract increase, the government does not pay a higher price.  Correspondingly, an accounting change that results in a

estimate in September 2000, with a slightly decreased net benefit to the government of $2.34 million through 2003. JX 6 (September 2000 Cost Impact Proposal). DCAA completed its audit of these cost-impact estimates on September 27, 2000 and found that Sikorsky was shifting increased costs to government fixed-price contracts under the January 1, 1999 accounting changes. JX 7-3 (2000 Audit of Cost Impact Proposals); Tr. 749:3 to 750:2 (Sherwood).

### C. *The 2004 Audit and 2006 Accounting Changes*

The record does not disclose the positions of the parties in the months after DCAA issued its audit on September 27, 2000. Nearly two years passed. Then, in August 2002, DCAA initiated another audit of Sikorsky's compliance with CAS 418. JX 8 (Notice to Sikorsky of DCAA CAS 418 Compliance Review). Two years after that, on October 29, 2004, DCAA issued its final report for this audit. JX 11 (2004 Final Audit Report). Mr. Boyer was a principal author of this final audit report. *See id.* at -18. In the report, DCAA found that Sikorsky's use of a direct labor cost base to allocate materiel overhead was "in potential noncompliance" with CAS 418, *id.* at -5 (2004 Final Audit Report), and that Sikorsky was in fact "in noncompliance with CAS 418" during the calendar year 2003, *id.* at -3. The audit report did not address the materiality of the potential noncompliance because "it would be difficult or nearly impossible for the auditor to determine" certain aspects of Sikorsky's costs. *Id.* at -13.

Although Sikorsky did not believe its accounting method was noncompliant, *see* Tr. 513:8-19, 616:19 to 617:1 (Chancio), it began to consider a change to the materiel overhead allocation method as part of a broader accounting overhaul that was to take effect on January 1, 2006. PX 40-3 to -4 (Memorandum on Resolution/Disposition of DCAA Finding of Noncompliance; CAS 418 (Aug. 15, 2005)); *see also* Tr. 617:2-7, 619:16 to 620:1 (Chancio). In 2005, Sikorsky discussed these proposed changes with Mr. Edward Weisman, the CACO who had replaced Ms. Sherwood in that position. *See* PX 40 (Memorandum on Resolution/Disposition of DCAA Finding of Noncompliance; CAS 418 (Aug. 15, 2005)); JX 13-1 (Letter from Weisman to Chancio (Sept. 2, 2005)). Those discussions encompassed both DCAA's 2004 audit report finding Sikorsky in noncompliance with CAS 418 and Sikorsky's newly proposed system. JX 13-1 (Letter from Weisman to Chancio (Sept. 2, 2005)). Mr. Weisman advised that

> [I]n view of the impending implementation of the SAP and ERP systems and the change from a Standard Cost to a Job Order Cost system in January, 2006, and your agreement to establish a Materi[e]l Handling rate under the next system, the CACO has determined that it would be neither cost-effective, nor of any substantial benefit to the [g]overnment, to require implementation of the changes recommended by DCAA at this time.

---

decrease in costs allocated to fixed-price government contracts is considered to be an increase in cost to the government, because the decrease is not reflected in the agreed-upon fixed price. Tr. 731:17-732:5 (Sherwood); *see also* 48 C.F.R. § 30.604(h)(3)(ii).

Negotiations over future fixed-price contracts, however, would take account of the higher allocation of indirect costs, and might, accordingly, result in higher costs to the government for those contracts.

*Id*. Sikorsky adopted a new materiel overhead allocation method, effective Jan. 1, 2006. Tr. 619:16 to 620:1 (Chancio).

Under the new accounting method, Sikorsky established a new materiel overhead pool that included purchasing, receiving, inspection, and supplier quality costs, but not materiel handling costs, which remained in the manufacturing overhead pools. Tr. 612:22 to 614:6 (Chancio). The new materiel overhead pool was allocated using a hybrid base of direct materiel costs less the costs of commercial engines. Tr. 614:7-10 (Chancio). The manufacturing overhead pools continued to be allocated using a direct labor base. Tr. 615:10-19 (Chancio). Officials at DCAA issued an audit report on February 15, 2006, opining that Sikorsky's revised methods "comply[] with applicable Cost Accounting Standards." PX 46-4 (2006 DCAA Audit of Sikorsky Revised Disclosure Statement); Tr. 909:8-10 (Boyer). A few days later, Mr. Weisman approved the new accounting method as compliant with CAS. PX 48 (Letter from Weisman to Chancio (Feb. 21, 2006)); Tr. 779:16-19 (Colandro).[19]

### D. *The Noncompliance Claim*

Mr. Weisman was succeeded by Mr. Frank Colandro as the government's contracting officer for Sikorsky in June 2006. Tr. 766:7-11, 773:9-10 (Test. of Frank Colandro, former Contracting Officer for DCMA, Cost and Pricing Center, assigned to Sikorsky). In early 2007, Mr. Colandro became aware of the 2004 audit finding noncompliant the accounting practice Sikorsky followed from 1999 to 2005, Tr. 773:21-23, 782:21 to 783:7 (Colandro); PX 54 (Boyer's worksheets), and began pursuing a potential claim against Sikorsky. Mr. Colandro issued a notice of potential CAS 418 noncompliance to Sikorsky in late March 2007, more than two years after DCAA issued the October 2004 audit report. *See* Tr. 782:4-7 (Colandro) (referring to a notice of potential noncompliance issued by him in April [sic] 2007).[20] Twenty months thereafter, on December 11, 2008, Mr. Colandro issued a final determination, asserting a claim against Sikorsky for $64,450,256 in principal and $15,263,164 in interest as of that date, pursuant to 48 C.F.R. § 30.605(b)(3)(ii). JX 17 (CACO's Final Decision). This decision had not been vetted by a DCMA review board. *Id*.; *see also* Tr. 798:6 to 799:3 (Colandro). DCMA waived action by a review board because it was concerned that it would not be able to assert its claim against Sikorsky within the CDA's prescribed statute of limitations. *See* JX 17-3 (CACO's Final Decision) (noting the "time[-]sensitive nature of this matter"); Tr. 798:3-5, 799:1-3 (Colandro) (stating that the matter was time sensitive because of "concern about the statute of limitations").

---

[19]The parties could not adduce any testimony from Mr. Weisman because he unfortunately died shortly after the first of these two consolidated lawsuits was filed. *See Sikorsky II*, 105 Fed. Cl. at 665.

[20]This delay violated the FAR. *See* 48 C.F.R. § 30.605(b)(1) ("[W]ithin 15 days of receiving a report of alleged noncompliance from the auditor, the CFAO shall . . . [n]otify the auditor that the CFAO disagrees . . . [or] [i]ssue a notice of potential noncompliance to the contractor.").

The final decision found that Sikorsky's cost accounting practice from 1999 through 2005 was noncompliant and that the noncompliance became material in 2003. JX 17 (CACO's Final Decision). In particular, "the manner in which [Sikorsky] allocated [m]ateri[e]l [o]perations expenses to final cost objectives using a base of direct labor did not comply with CAS 418." *Id*. at -1. The decision further stated that Sikorsky's method violated CAS 418–40(b) and CAS 418–40(c) because "the pool costs, which included significant costs associated with the management of activities involving direct materi[e]l, were not being allocated using a base that was representative of the activity being managed or supervised." *Id*. at -4. Sikorsky filed suit in this court to challenge this claim on December 8, 2009.

## STANDARDS FOR DECISION

The government made its demand for approximately $80 million under the CDA, 41 U.S.C. §§ 7101-7109. As that Act requires, the government's claim against Sikorsky was "the subject of a written decision by the contracting officer." *Id.* § 7103(a)(3). This court addresses the contracting officer's decision *de novo*. *Id.* § 7104(b)(4). The government bears the burden of proof to establish that the accounting method Sikorsky used from 1999 to 2005 did not comply with the CAS. *See Raytheon Co. v. United States*, 105 Fed. Cl. 236, 270 (2012) (citing *General Dynamics Corp.*, ASBCA No. 56744, 11–2 BCA ¶ 34,787, 2011 WL 2624447, at *11 (June 21, 2011) (in turn citing *Ball Corp.*, ASBCA No. 49118, 00–1 BCA ¶ 30,864, 2000 WL 362429, at *12 (Apr. 3, 2000))).[21] The government must make this showing by a preponderance of the evidence. *See, e.g., Thomas v. Nicholson*, 423 F.3d 1279, 1283 (Fed. Cir. 2005) ("'The "preponderance of the evidence" formulation is the general burden assigned in civil cases for factual matters.'" (quoting *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 769 (Fed. Cir. 1993))); *Gingerich v. United States*, 77 Fed. Cl. 231, 240 (2007) (applying this burden to a claim for a tax refund).

Sikorsky contends the government's claim is barred by the six-year statute of limitations set forth in the CDA. *See* 41 U.S.C. § 7103(a)(4)(A) ("Each claim by a contractor against the [f]ederal [g]overnment relating to a contract and each claim by the [f]ederal [g]overnment against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim."). Sikorsky carries the burden of proving the elements of this affirmative defense, *see Brunswick Bank & Trust Co. v. United States*, 707 F.2d 1355, 1360 (Fed. Cir. 1983); *Eden Isle Marina, Inc. v. United States*, 89 Fed. Cl. 480, 523 (2009), and must establish the defense by a preponderance of the evidence, *see Thomas*, 423 F.3d at 1283.

---

[21]Although decisions of the Armed Services Board of Contract Appeals ("ASBCA") "are not accorded *stare decisis* effect, the court may find the reasoning contained therein persuasive." *West Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 29 n.29 (2008) (quoting *Universal Restoration, Inc. v. United States*, 16 Cl. Ct. 214, 218 (1989)) (internal quotations omitted); *see also Raytheon*, 105 Fed. Cl. at 270 n.65.

# ANALYSIS

## I. **Statute of Limitations**

The CDA requires the federal government to submit each claim against a contractor relating to a contract "within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). The government submitted its claim on December 11, 2008, the date the CACO's final decision was issued; therefore, the government's claim is barred if it accrued before December 11, 2002. The CDA's statute of limitations reflects the general rule that "a cause of action accrues when all events necessary to state a claim have occurred." *Chevron U.S.A., Inc. v. United States*, 923 F.2d 830, 834 (Fed. Cir. 1991) (citing *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988)). As such, a government claim accrues under the CDA, as defined in the FAR, "when all events[] that fix the alleged liability of . . . the contractor and permit assertion of the claim, were known or should have been known." 48 C.F.R. § 33.201.

"For liability to be fixed, some injury must have occurred[, but] monetary damages need not have been incurred." 48 C.F.R. § 33.201. In addition, "[t]o determine when liability is fixed, we start by examining the legal basis of the particular claim." *Gray Personnel, Inc.*, ASBCA No. 54652, 06–2 BCA ¶ 33,378, 2006 WL 2390292, at *8; *see also, e.g., Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (applying "applicable principles of general contract law" to determine when a government's claim for breach of contract accrued (internal quotation marks omitted)). In this instance, Sikorsky's alleged noncompliance with CAS 418 was the legal basis for the government's claim. For a CAS 418 noncompliance claim to accrue, the government must have actual or constructive notice of the CAS 418 violation. *Sikorsky II*, 105 Fed. Cl. at 672. Whether events fixing potential liability have occurred is "determined under an objective standard; a [party] does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1381 (Fed. Cir. 2012) (quoting *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995)). The question of when a claimant should know of its claim is an inquiry that depends on the reasonableness of the claimant's actions. *See Holmes v. United States*, 657 F.3d 1303, 1320 (Fed. Cir. 2011) (citing *Ingrum v. United States*, 560 F.3d 1311, 1315-16, n.1 (Fed. Cir. 2009)).

Mr. Boyer, DCAA's auditor, was the principal author of an April 1999 draft audit report that would have concluded that Sikorsky's allocation of materiel overhead using a direct labor base was in noncompliance with CAS 418, resulting in increased costs to the government of approximately $8 million in 2001 and $30 million in 2008. JX 3-10 (1999 Draft Audit Report); Tr. 876:16 to 877:10 (Boyer). Mr. Boyer noted that there were "a number of uncertainties" regarding both of his estimates, because they primarily reflected Sikorsky's own estimates contained in its full pricing rate proposal. Tr. 829:22 to 830:6 (Boyer). In addition, he did not include estimates of cost impacts for 1999 and 2000 because "there wasn't a significant impact" for those years. Tr. 829:12-21 (Boyer). Mr. Boyer's superiors, Ms. Sherwood, the CACO, and Mr. Anthony O'Falt, the resident DCAA auditor for Sikorsky, decided not to issue this April 1999 draft report because they did not believe that the accounting change materially affected government cost at that time. *See* Tr. 883:9-12 (Boyer); *see also* PX 20-7 (Facsimile of 1999 Draft Audit Report to Anthony O'Falt); Tr. 892:1-18 (Boyer); Tr. 675:5-12 (Sherwood). Rather,

12

in July 1999, Ms. Sherwood issued a final audit report which determined that Sikorsky was compliant with CAS 418 because its "cost accounting change does not [in 1999] result in a material impact on CAS covered contracts." JX 4-4 (1999 Final Audit Report). The audit report requested that Sikorsky submit a cost-impact proposal. *Id.* at -1. Sikorsky submitted that proposal in September 2000, reporting a net benefit to the government of $2.34 million through 2003. JX 6-1 (September 2000 Cost Impact Proposal). DCAA audited this proposal and found that Sikorsky was shifting increased costs to government fixed-price contracts under the January 1, 1999 accounting changes. JX 7-3 (2000 Audit of Cost Impact Proposals). However, no evidence was proffered to demonstrate that the government viewed Sikorsky's cost-impact proposal as anything more than a correction to a previous maladjustment. Ms. Sherwood could only say that the increased costs were "possibly" due to noncompliance. Tr. 750:18-24 (Sherwood). In short, although government officials responsible for the 1999 audit believed that Sikorsky's allocation method resulted in an indirect cost pool that changed the causal relationship to cost objectives, those officials had only seen Mr. Boyer's and Sikorsky's estimates reflecting potential future contracts. Because they did not have reliable evidence of a significant effect on present government costs, they reasonably could decide that Sikorksy's allocation method was then appropriate, or at least not inappropriate. As such, the government did not have actual or constructive notice of any CAS violation at that time.[22]

In August 2002, nearly two years after the 2000 Cost Impact Proposal, DCAA initiated another audit of Sikorsky's compliance with CAS 418. JX 8 (Notice to Sikorsky of DCAA CAS 418 Compliance Review). DCAA waited until this time to reexamine whether the allocation practice for material overhead was having a significant effect because "according to the information that [they] had [in 2000], that would be the first year that would be really worth looking at." Tr. 846:1 to 847:2 (Boyer); DX 21 (E-mail from Boyer to Thomas Maher, Manager of Sikorsky's Government Contract Accounting (Aug. 30, 2002)). Mr. Boyer authored this audit report, and he worked throughout 2003 to gather information about direct materiel costs from Sikorsky personnel to perform calculations for the audit. *See, e.g.,* DX 31 (E-mail from Boyer to

---

[22]The government claimed that its knowledge of a CAS 418 violation turned on the knowledge of the CACOs, Ms. Sherwood and Mr. Weisman, arguing that "the standard . . . is what would a reasonable man know or should have known. And the relevant reasonable man in this case . . . is the contracting officer because it's the contracting officer that has to make the decision about whether to assert a claim." H'rg Tr. 9:7-13 (Closing Arg. (Jan. 25, 2013)). The government's position in this regard has been criticized and rejected in other cases on the ground that such a rule would permit "both contractors and the government [to] suspend accrual by internally compartmentalizing relevant information and insulating senior decision makers from it for as long as they choose. Nothing in FAR § 33.201, which commences accrual of a claim when the events fixing alleged liability 'were known or should have been known' by a party, contemplates permitting such gamesmanship." *Raytheon Missile Sys.*, ASBCA No. 58011, 2013 WL 685219, at *5 (Jan. 28, 2013). In this instance, the court need not rule on the government's contention because the facts show that Ms. Sherwood was cognizant of the pertinent circumstances. She was aware of Mr. Boyer's calculations regarding the cost impact of Sikorsky's accounting change, as well as Sikorsky's own cost-impact proposals, which she requested. *See* PX 13-3 (Handwritten Meeting Notes of Robert Boyer); Tr. 887:9-21 (Boyer); *see also* JX 4-1 (1999 Final Audit Report).

13

Heather Biewald, a manager in Sikorsky's government accounting group (Mar. 12, 2003)); DX 38 (E-mail from Biewald to Boyer (Mar. 25, 2003)); DX 58 (E-mail from Biewald to Boyer (Sept. 26, 2003)); *see also* 838:24 to 843:15 (Boyer). Mr. Boyer had made an assessment of the cost effects of Sikorsky's accounting change by December 2003. *See* Tr. 844:1-22 (Boyer). DCAA released the final audit report in October 2004, finding that Sikorsky's use of a direct labor cost base to allocate materiel was "in potential noncompliance" with CAS 418, JX 11-5 (2004 Final Audit Report), and that Sikorsky was in fact "in noncompliance with CAS 418" during the calendar year 2003, *id*. at -3. The report did not address the materiality of the potential noncompliance because "it would be difficult or nearly impossible for the auditor to determine" certain aspects of Sikorsky's costs. *Id*. at -13. Although a definitive calculation of the effect on government costs was not made, the government was nonetheless aware that Sikorsky's allocation method had affected government costs in 2003 and would likely do so for future years as well. Accordingly, at that point, perhaps in December 2003 and certainly by October 2004, the government assuredly was put on notice of Sikorsky's potential CAS 418 violation, and its claim that Sikorsky had violated CAS 418 had accrued.

Ordinarily, however, "[a]ccrual of a contracting party's claim is *not* suspended until it performs an audit or other financial analysis to determine the amount of its damages." *Raytheon Missile Sys.*, ASBCA No. 58011, 2013 WL 685219, at *5 (emphasis added); *see also Raytheon Co. v. United States*, 104 Fed. Cl. 327, 330-31 (2012) (addressing but rejecting the government's contention that its claim accrued "when it completed the initial audit and assessment of Raytheon's costs"). Rather, "[t]he fact of an injury must simply be knowable," *Raytheon Missile Sys.*, 2013 WL 685219, at *5, which is "determined under an objective standard," *FloorPro*, 680 F.3d at 1381. Because knowledge is dependent upon the reasonableness of the claimant's actions, *Holmes*, 657 F.3d at 1320, the court must examine whether DCAA had reasonable grounds to know of a potential violation of CAS 418 by Sikorsky prior to gathering detailed information from Sikorsky in 2003 and undertaking an audit in 2003 and 2004.

Sikorsky argues that the cost-impact report it provided in February 2000 sufficed to put the government on notice that in 2001 approximately $4.7 million in costs would shift to existing government contracts from commercial contracts as a result of the accounting change made in 1999. Pl.'s Post-Trial Br. at 74 (citing JX 5-2 (February 2000 Cost Impact Proposal)). Because existing fixed-price contracts were involved, this change in allocation of indirect costs was deemed a "benefit" to the government. *See supra*, at 8 & n.18. When and if new CAS-covered contracts came into being, the shift in cost allocations to the government would likely result in higher prices for those contracts. In approving the accounting change made in 1999, Ms. Sherwood advised Sikorsky that the effects of the accounting change would "be continually monitored" and "m[ight] require redress in the future." JX 4-1 (1999 Final Audit Report). In that respect, although Sikorsky's cost-impact submission in 2000 sufficed to confirm the effect of the accounting change on existing contracts, the run-off of existing contracts and the advent of new contracts would provide a more significant test of the change. Through 2003, Sikorsky's cost-impact proposal submitted in September 2000 still showed a net benefit to the government of $2.34 million. *See* JX 6-1 (September 2000 Cost Impact Proposal). At that point, DCAA's auditor, Mr. Boyer, was seeking further contemporaneous cost information from Sikorsky in 2003 to conduct an audit that would examine actual results in 2003 and look beyond that year to the future. In these specific circumstances, the government was under a duty to inquire, but it

14

had no actual or constructive knowledge of a potential CAS violation at Sikorsky until the new information was gathered and assimilated.

As a consequence, the government's claim in these cases is distinguishable from those in the *Raytheon* cases insofar as the statute of limitations in the CDA is concerned. In those cases, the government made the claim that the statute of limitations did not begin to run until it had completed an audit reflecting "evidence new to the government." *Raytheon Co. v. United States*, 105 Fed. Cl. 351, 352 (2012), *denying reconsideration of the prior ruling at* 104 Fed. Cl. 327; *see also Raytheon Missile Sys.*, ASBCA No. 58011, 2013 WL 685219, at *5-6. Both the court and the Armed Services Branch of Contract Appeals found that the information necessary to, and sufficient for, the government's determination of the claim was available well before the audit was performed. *Raytheon*, 105 Fed. Cl. at 353; *Raytheon Missile Sys.*, 2013 WL 685219, at *6. The requisite information was not available to the government in this instance.

In short, Sikorsky has not met its burden to show that the government had actual or constructive knowledge of a potential claim under CAS 418 prior to December 2002, and Mr. Colandro's assertion of the government's claim on December 11, 2008, was within the six-year statute of limitations prescribed by the CDA. The court must therefore proceed to address the merits of the government's claim.

## II. **CAS 418**

### A. *Significance of Costs of Management and Supervision*

CAS 418 contains two subsections, 418–50(d) and 418–50(e), that govern the allocation methods that may be used for indirect cost pools. These subsections separate "indirect cost pools by inclusion, or not, of significant costs of management or supervision of activities related to direct labor or materiel costs." *Sikorsky I*, 102 Fed. Cl. at 58. Subsection 418–50(d) applies to pools containing such significant costs, while Subsection 418–50(e) applies to pools in which such significant costs are absent. "Consequently, whether Sikorsky's materiel overhead pool falls under Subsection 418–50(d) or under Subsection 418–50(e) turns on whether the pool contained significant costs of management or supervision of direct-cost activities." *Id.* The government concurs that this is the manner in which CAS 418 operates. Tr. 875:6-14 (Boyer) (agreeing that "[t]he question of whether an overhead pool includes significant costs of management and supervision of activities involving direct labor or direct materi[e]l . . . determines whether 50(d) or 50(e) applies"). As to significance, *i.e.*, materiality, 48 C.F.R. § 9903.305 provides criteria that "shall be considered where appropriate" in "determining whether amounts of cost are material or immaterial."[23] The first three of these factors specified are relevant to determining whether Sikorsky's materiel overhead pool contained significant direct-activity management and supervision costs:

> (a) The absolute dollar amount involved. The larger the dollar amount, the more likely that it will be material.

---

[23]As discussed *supra*, at n.11, the word "material" as an adjective is used in the text of CAS 418–50(d) and 50(e), but the synonym "significant" is used by the court for the sake of clarity.

(b) The amount of contract cost compared with the amount under consideration. The larger the proportion of the amount under consideration to contract cost, the more likely it is to be material.

(c) The relationship between a cost item and a cost objective. Direct cost items, especially if the amounts are themselves part of a base for allocation of indirect costs, will normally have more impact than the same amount of indirect costs.

48 C.F.R. § 9903.305(a)-(c). Sikorsky's materiel overhead pool from 1999 through 2005 encompassed two categories of indirect costs: those that fell under the materiel logistics umbrella and those incurred through purchasing activities. The costs of management and supervision associated with each category will be addressed separately.

Materiel logistics costs encompass the receipt and storage of materiel and the subsequent supply of materiel to the manufacturing labor force at assembly points. *See* Tr. 940:8 to 949:23 (Kopchick); Tr. 266:16 to 267:13 (Trompetter). Of the approximately 350 to 375 Sikorsky employees in the materiel logistics group, only six to eight were managers, and fifteen to twenty were supervisors. Tr. 959:17 to 961:14, 962:16-963:1 (Kopchick). At most, then, managers and supervisors comprised seven percent of the materiel logistics department workforce. *See* PDX 326; *see also* Tr. 958:19 to 962:15 (Kopchick). Moreover, these managers and supervisors did not confine their activities to the traditional tasks of overseeing other employees and the department. For parts of their workdays, some supervisors "actually did the same job that the people under [them] did," such as issuing work orders to the manufacturing floor to make a part or providing the purchasing department with a purchase requisition to specify what parts must be bought. Tr. 964:16-25 (Kopchick); *see also* Tr. 941:6 to 942:1 (Kopchick).

The first materiality factor considers the absolute dollar amount involved. In 2005, the last year Sikorsky used the allocation method at issue, the salaries and wages of "all the people . . . engaged in the materi[e]l overhead activities" totaled about $[***] million, while the total materiel operations pool encompassed about $[***] million in costs. Tr. 106:1-9 (Trompetter); *see* JX 38-126 (December 2005 NAVAIR Report). The salaries and wages of the materiel logistics workforce represent only a portion of the $[***] million figure, and the salaries of the twenty-eight materiel logistics supervisors and managers are necessarily a smaller fraction of that portion. *See* Tr. 106:10-12 (Trompetter) (noting that the "supervisory costs would be embedded" in the $[***] million figure). Even the salaries of those twenty-eight employees cannot be counted in full as management and supervision costs, because some managers and supervisors performed standard materiel logistics tasks in addition to supervisory duties. In short, the absolute dollar amount that can be attributed to materiel logistics management and supervision is relatively small, especially considered in the context of Sikorsky's overall business revenues.

The second factor weighs the "amount of contract cost compared with the amount under consideration." 48 C.F.R. § 9903.305(b). The total cost of Sikorsky's government contracts at issue exceeded $2 billion, *see generally* PX 54 (Boyer's Worksheets); Tr. 910:2-20 (Boyer), with the result that the total materiel logistics costs were less than one percent of this amount, even disregarding commercial revenues, and the total management and supervision costs for material logistics were much smaller than that, even disregarding the work directly performed by

managers and supervisors. The third factor provides that direct costs should be weighted more heavily than indirect costs. In the circumstances, that weighting is manifestly apparent. Therefore, the evidence, as applied to all three factors, demonstrates that the management and supervision costs associated with materiel logistics were insignificant.

Purchasing activities comprise the remainder of the materiel overhead pool costs. From 1999 through 2005, there were about 140 employees in Sikorsky's purchasing group. Tr. 987:24 to 988:3 (Altieri). About twenty of those employees, or 14 percent of the purchasing group staff, were managers or supervisors. *See* Tr. 988:4 to -25 (Altieri). The twenty employees in question were "definitely not" engaged in traditional management activities full time; they undertook complex "negotiations with suppliers . . . [that] couldn't get done at the lower level." Tr. 993:7-22 (Altieri).

The government took a categorical approach to purchasing costs, asserting in its October 2004 audit report that 54 percent of Sikorsky's materiel operations pool represented costs of management or supervision. JX 11-4 (2004 DCAA Audit Report). This percentage was chosen "[b]ecause purchasing activity was approximately 54 percent of the [pool's] indirect salaries and wages and related occupancy." *See* Tr. 876:8-15 (Boyer). In short, DCAA equated all purchasing activity with management or supervision. To accord with the CAS, however, materiality should be determined by focusing on the salaries and wages of those purchasing personnel who held the title of manager or supervisor and deducting the portion of their salaries and wages attributable to the time they spent conducting purchasing tasks themselves. *See Sikorsky I*, 102 Fed. Cl. at 52-53. When these adjustments are made, management and supervision costs related to purchasing constitute less than ten percent of the purchasing costs included in the 2005 materiel overhead pool, and are a lesser fraction of the total indirect pool cost. And, as is the case with materiel logistics, the management and supervision costs for purchasing are indirect costs that represent a small absolute dollar amount relative to the total cost of the contracts at issue. As such, they are insignificant.

At trial, the parties disputed the effect on management and supervision costs of a change to Sikorsky's traditional business model that occurred during the period of 1999 through 2005. During the 1990s and early 2000s, Sikorsky experienced a "paradigm shift" in its business model, Tr. 70:18-21 (Trompetter), moving from a "make" house that "prided itself on making everything but tires, windshields, and engines" to a "buy" operation that "would be buying parts for [its] helicopters that don't come in a box on a truck where you can't tell what it is." Tr. 72:25 to 73:5, 70:23-25 (Trompetter); *see also* Tr. 773:21 to 774:4 (Colandro) (agreeing that Sikorsky was increasingly outsourcing and evolving from a make to a buy operation from 1999 through 2005). A "make part is something that is assembled, made within Sikorsky," while a buy part is "[a] part that's . . . purchased from an external supplier." Tr. 994:1-6 (Altieri). The shift to buy parts was conceived in the mid-1990s and implemented during the 1999 through 2005 period, during which Sikorsky purchased [***] for two commercial aircraft, the S-92 and S-76, from outside suppliers. Tr. 994:18 to 996:10 (Altieri); *see also* 356:10 to 357:23 (Trompetter). Although outsourcing, or the buying of completed components, occurred in connection with both military and commercial aircraft, the outsourcing programs for commercial aircraft were "deeper[ and] more concentrated." Tr. 996:14-15 (Altieri). As a result, Sikorsky outsourced more commercial than military components from 1999 through 2005, and consequently made

17

more parts for military aircraft than for commercial ones during that time period. Tr. 997:7-14 (Altieri); Tr. 358:7-10 (Trompetter).

Fewer materiel overhead resources were expended on "buy" parts. Tr. 379:14-20 (Trompetter); Tr. 956:7-10 (Kopchick); Tr. 1000:3-8 (Altieri). During the initial outsourcing of a "buy" component, costs were incurred as Sikorsky assessed and qualified the new supplier. Tr. 376:7-17, 381:2 to 382:7 (Trompetter); Tr. 1001:12-21, 1002:6-20 (Altieri). The assessment process involved purchasing department employees, whose associated costs would be included within materiel overhead. These employees performed standard purchasing tasks, not management or supervisory functions. *See* Tr. 997:22 to 998:10 (Altieri). In addition, assessment required the work of engineering and other departments, whose costs were not allocated to the materiel overhead pool, but rather to engineering and other direct-cost categories. *See* Tr. 381:2 to 382:14 (Trompetter); Tr. 997:15 to 999:21 (Altieri). Once the make-to-buy transition was complete for a component, materiel overhead costs dropped drastically, with purchasing costs requiring "one full-time employee or less" for a substantial component. Tr. 999:22 to 1000:2 (Altieri); *see also* Tr. 376:7 to 377:4 (Trompetter). Consequently, Sikorsky's shift from a wholly "make" house to a partially "buy" house had the effect of reducing, not increasing, total indirect costs in the materiel overhead pool, as well as the relative proportion of management and supervisory costs. In sum, the make-to-buy shift that occurred did not result in the management and supervision of activities involving direct labor or direct materiel costs becoming significant where they were not previously so.

In light of this factual showing, Subsection 418–50(e), not 418–50(d), applies to Sikorsky's materiel overhead pool.

## B. *A Direct-Labor Cost-Surrogate*

CAS 418–50(e) notes that "[h]omogeneous indirect cost pools of this type have a direct and definitive relationship between the activities in the pool and benefiting cost objectives. The pooled costs shall be allocated using an appropriate measure of resource consumption. This determination shall be made in accordance with the following criteria taking into consideration the individual circumstances." 48 C.F.R. § 9904.418–50(e). The Subsection then lists three possible measures. The first measure in the hierarchy, according to Subsection 418–50(e)(1), is "a measure of resource consumption of the activities of the indirect cost pool." *Id.* As applied to Sikorsky's materiel overhead pool, this would have required Sikorsky to track the time spent by each materiel overhead employee on each activity for the benefit of a particular contract. Tr. 953:11-14 (Kopchick); *see also* Tr. 519:16 to 520:3 (Chancio). Such a method was impractical because there was "quite a bit of commonality" between contracts. Tr. 954:1-2 (Kopchick); *see also* Tr. 267:19 to 268:7 (Trompetter). For example, logistics employees moved multiple parts for multiple contracts at the same time, and frequently, different parts would be suitable for use in more than one particular contract. Tr. 952:24 to 954:2 (Kopchick). It was not reasonable to expect Sikorsky to adopt such a cumbersome, inefficient recordkeeping system, and thus the method outlined in the first option in the hierarchy was not an appropriate way to allocate pooled costs.

18

Alternatively, CAS 418–50(e)(2) instructs that "a measure of the output of the activities of the indirect cost pool" is "the next best representation of the beneficial or causal relationship for allocation." 48 C.F.R. § 9904. 418–50(e)(2)(i). Tracking output rather than resources consumed would require Sikorsky to monitor closely the purchasing and logistic groups' activities. Sikorsky did account for the number of boxes received on a weekly basis, and the number of work orders and purchase requisitions issued by each of the parts planners weekly, but it did not "keep track of the output of its employees' activities in terms of what contract that output was for." Tr. 954:5-9, 954:12 to 955:1 (Kopchick); *see also* Tr. 268:8-16 (Trompetter) (explaining that Sikorsky does not track the number of boxes associated with each contract that a truck delivers to an assembly line). Such recordkeeping would be impractical, as each box, truck, and work order could easily contain parts or information for multiple contracts, making it difficult accurately to allocate indirect materiel costs to an individual contract.

"If neither resources consumed nor output of the activities can be measured practically, a surrogate that varies in proportion to the services received shall be used to measure the resources consumed" to allocate the pooled costs. 48 C.F.R. § 9904.418–50(e)(3). "Generally, such surrogates measure the activity of the cost objectives receiving the service." *Id.* A proper surrogate under CAS 418–50(e)(3) is one that "varies in proportion to the services received." *Id.* As that language suggests, Sikorsky thus had some discretion in choosing a surrogate. *See Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003) (alluding to the discretion provided within the CAS by noting that "[a contractor] *elected* to use a form of total cost input accounting based on 'materi[e]l costs'" and that "[h]aving *chosen* a base composed of 'materi[e]l costs,'" the contractor was required to include all significant elements of the cost of the materiels (emphasis added)). In this instance, Sikorsky elected to use a direct labor surrogate because materiel overhead activities are closely coordinated with direct labor, *see* Tr. 949:24 to 950:12 (Kopchick), Tr. 251:5-11 (Trompetter), such that direct labors costs should vary in proportion to materiel overhead.

Much of the evidence at trial focused on whether direct labor was a proper surrogate, with the government contending that Sikorsky should have instead relied upon a direct materiel base. *See*, *e.g.*, Tr. 780:2-12 (Colandro); Tr. 872:11 to 873:9, 912:1 to 914:12 (Boyer).[24]

---

[24]The government's witnesses took the position that a "direct materi[e]l base should be used for materi[e]l handling expenses," Tr. 780:4-5 (Colandro), relying on CAS Subsections 418–50(b) and (d), Tr. 780:11-12 (Colandro). Those Subsections address, respectively, homogeneity and pools that include significant costs of management or supervision of activities related to direct labor or materiel costs.

The government maintains that CAS 418 "requires a final overhead pool for materi[e]l overhead costs separate from manufacturing costs," Def.'s Post-Trial Br. at 51, and posits that Sikorsky's pools were not homogeneous because the company included materiel overhead within final manufacturing overhead pools. *Id.* at 48. Because the government posits that these pools were not homogeneous, it argues that CAS 418–50(e), which assumes homogeneity, cannot apply. *See id.* at 61 ("Sikorsky seeks to reply upon CAS 418–50(e). And CAS 418–50(e) does not fit the two relevant final pools."). It then concludes that CAS 418–50(d) must apply to Sikorsky's materiel overhead costs, and contends that only one method in that Subsection may be used — CAS 418–50(d)(iv), because it states that "[a] materi[e]l cost base is appropriate if the

Materiel overhead and direct labor costs generally followed a similar pattern from 1999 through 2005, increasing from 2000 to 2002, decreasing in 2003, and increasing in 2004 and 2005. *See* PX 85 (Summary of Sikorsky's Costs, 1993-2005); Tr. 308:7-15, 309:24 to 310:9 (Trompetter); *see also* PDX 309 (Graph of Direct Labor and Materiel Overhead Costs, 1999-2005), reproduced *infra*.[25] Contrastingly, from 1999 through 2005, Sikorsky's direct materiel costs increased consistently and substantially, from about $[***] million in 1999 to $[***] billion in 2005, *see* PX 89 (Excerpt from Sikorsky's Contract Cost Database); *see also* Tr. 313:8-14 (Trompetter) (explaining that the contract cost database tracked direct materiel costs charged to contracts), but during that same time period, materiel overhead costs remained relatively constant, ranging from $[***] to $[***] million, DX 1017 (Summary Exhibit of Data from 1999-2005 NAVAIR Reports).[26]

The sharp uptick in direct materiel costs can be attributed to Sikorsky's shift from making most parts in-house to buying a portion of finished components from suppliers, as discussed *supra*. *See* Tr. 378:2 to 379:20 (Trompetter); Tr. 863:9-15 (Boyer). A shift toward buying more finished parts created higher direct materiel costs because the price Sikorsky paid for finished components reflected the suppliers' cost of production, including direct materiel costs and materiel overhead costs incurred in manufacturing those components, as well as profit. Tr. 957:23 to 958:14 (Kopchick); *see also* Tr. 377:5 to 378:1 (Trompetter). Although some materiel overhead costs were incurred during the transition to buying a component, *see* 376:7-17, 381:2 to 382:7 (Trompetter); Tr. 1001:12-21, 1002:6-20 (Altieri), the materiel overhead costs associated with buy parts decreased once the transition was complete, because only minimal purchasing and logistics resources were needed to manage purchased components, *see* Tr. 999:22 to 1000:2 (Altieri); Tr. 208:9-22, 376:7 to 377:4 (Trompetter).

---

activity being managed or supervised is a materi[e]l-related activity." *See id.* at 64 ("[T]he CAS Board decided that a direct materi[e]l cost base is appropriate for materi[e]l overhead costs, and prescribed that base in an effort to bring some uniformity to contractor accounting."). This line of reasoning assumes that CAS 418 by its terms requires materiel overhead costs to be allocated only by direct materiel costs, without any textual support for this contention. It ignores the plain text of CAS 418 which provides that Subsection 418–50(e) governs pools that do not include significant costs of management or supervision, and specifies that these pools, by definition, are homogeneous. *See Sikorsky I*, 102 Fed. Cl. at 58.

[25]The two variables do not track each other in 1999, an aberration explained by an output decline in 1999 during which fewer aircraft deliveries were made. *See* PX 85 (Summary of Sikorsky's Costs, 1993-2005); Tr. 310:20 to 311:12 (Trompetter). The lull caused direct labor costs to decrease, and also resulted in a layoff of more than [***] employees. *See id.* Subsequently, materiel overhead costs decreased in 2000 due to the loss of employees involved in materiel overhead operations. PX 85 (Summary of Sikorsky's Costs, 1993-2005); Tr. 311:18-24 (Trompetter).

[26]Sikorsky's materiel overhead costs increased modestly from 1999 through 2005 due in large part to increased aircraft deliveries during that time period. Tr. 394:14-24 (Trompetter).

In response to these data, the government proffered expert testimony from a statistician, Dr. Ali Arab, who attempted to demonstrate that a direct materiel base was a more appropriate surrogate than a direct labor base.[27] Dr. Arab presented several regression analyses performed on Sikorsky's cost accounting data. He analyzed the correlation between direct labor and materiel overhead costs from 2003 through 2005, DX 1016 (Excerpt of Arab Report), as well as the relationship between those costs for the years 1999 to 2005, DX 1017 (Excerpt of Arab Report). Dr. Arab found that there was no statistically significant relationship between the variables in both of those instances. Tr. 418:16-17, 419:18-19 (Arab). A third analysis, looking at the years 1993 to 1998, compared Sikorsky's net materiel overhead with the allocation base used during those years — direct materiel costs less the cost of commercial engines and used helicopters. *See* DX 1019(a) (Excerpt of Arab Report); Tr. 420:6 to 421:11 (Arab). Dr. Arab concluded that the relationship between these two variables during those years was statistically significant. Tr. 421:8-11 (Arab). Dr. Arab also examined the relationship between a direct labor base and materiel overhead costs for those years, and found that it was not statistically significant. *See* DX 1020(a) (Excerpt of Arab Report); Tr. 423:7-20 (Arab). Lastly, Dr. Arab analyzed the relationship between labor costs and net materiel overhead from 1993 to 2005, and found there was no statistical significance. *See* DX 1018(a) (Excerpt of Arab Report); Tr. 424:3-11 (Arab).

Questions arose respecting these analyses, however. First, because relatively few data points were available, the analyses had a lower "power" value than that which is typically needed to "reliably conduct statistical inference." Tr. 426:10-19, Tr. 433:12-15 (Arab).[28] Normally, "[w]hen a statistical study with low power fails to show a significant effect, the results are more fairly described as inconclusive than negative." Tr. 433:16-20 (Arab). Accordingly, Dr. Arab's low-power analyses have limited utility. The 1993 to 2005 analysis is problematic for other reasons. It relied on "net" materiel overhead costs, which from 1993 to 1998 were adjusted for inventory write-downs or transfers to other accounts, but were unadjusted for 1999 to 2005. Tr. 457:2-5 (Arab). The adjustments were made for accounting purposes and did not measure materiel overhead resource consumption. Tr. 344:21 to 345:12, 345:20-24, 346:7-10 (Trompetter). Consequently, it is inappropriate to use adjusted or "net" materiel overhead when considering whether direct labor costs vary in proportion to materiel overhead costs. Furthermore, the 1993 to 2005 analysis failed to take account of an influential point, *i.e.*, "a data point that behaves differently than the majority of the data and thereby dominates the analysis." Tr. 457:17-23 (Arab). The direct-labor-cost data point for 1999 was influential, Tr. 458:11-20 (Arab), and was significantly lower than the data points for other years because of a decrease in aircraft deliveries during 1999 and a substantial reduction in the work force in that year, *see supra*, at n.25. Without this influential data point, "the relationship between direct labor costs and materiel overhead would be stronger." Tr. 458:25 to 459:4 (Arab). Indeed, Dr. Herbert I. Weisberg, Sikorsky's expert statistician, performed an "alternative version of the analysis that

[27]At the same time, the government acknowledged that distortions due to GFM arise when a direct materiel base is used, but not when a direct labor base is employed. *See* Tr. 867:1-8 (Boyer).

[28]The standard practice is to require a power value of 0.8 or above to draw reliable statistical inferences. Tr. 426:16-19 (Arab).

removed that influential point" from the period of 1993 through 2005, using direct labor as the independent variable and materiel overhead as the dependent variable. Tr. 1033:19 to 1034:15 (Weisberg); *see also* PDX 320 (Weisberg Graph of 1993-2005 Direct Labor and Materiel Overhead With 1999 Removed). With the data from 1999 removed, the relationship between the two variables was statistically significant. *See* PDX 319 (Weisberg Analysis of 1993-2005 Direct Labor and Materiel Overhead With 1999 Removed); Tr. 1034:25 to 1035:11 (Weisberg).

Second, the relative stability of materiel overhead costs from 1999 to 2005, which varied within an annual range of $[***] to $[***] million, as discussed *supra*, further constrains the value of the statistical analyses performed. *See* Tr. 1039:12-23 (Weisberg). Regression analyses measure the proportion of variation in a dependent variable, here, materiel overhead costs, that can be explained by an independent variable, here, either direct labor or direct materiel costs. *See* Tr. 1039:24 to 1040:12 (Weisberg). Thus, "if there isn't much variation to explain in the first place," the importance of a measure of a statistical relationship between the two variables "may be quite small." Tr. 1040:9-12 (Weisberg). In this instance, because the dependent variable, materiel overhead costs, did not fluctuate greatly, there was not much variation to explain, and any statistical relationship between materiel overhead costs and direct labor or direct materiel costs was relatively unimportant. In short, the statistical analyses are of little value in determining whether a particular base was an appropriate allocation measure for materiel overhead costs.

The demonstratives that follow graphically depict the relationship between direct materiel costs and materiel overhead, as well as direct labor costs and materiel overhead. The first, PDX 309, illustrates Sikorsky's direct labor and materiel overhead costs from 1999 through 2005. *See* Tr. 307:8-15 (Trompetter). The second, PDX 310, compares the increase in direct materiel costs with the relative stability of materiel overhead costs for those years. *See* Tr. 332:16 to 333:6 (Trompetter).



Source: JX 30, JX 31, JX 32, JX 33, JX 34, JX 36, JX 38, DX 1017

Sikorsky Demonstrative Ex. 309



Source: PX 89, JX 30, JX 31, JX 32, JX 33, JX 34, JX 36, JX 38, DX 1017

Sikorsky Demonstrative Ex. 310

The government also claimed at trial, for the first time in the course of this litigation, that Sikorsky should have segregated GFM-related materiel overhead costs from other materiel overhead costs, collected the GFM-related costs in a separate indirect cost pool, and directly allocated those expenses to the government. *See* Tr. 389:14 to 390:19 (Trompetter). Such a method is not required by CAS 418–50(e), nor would it be practical for Sikorsky to track GFM-related materiel overhead costs separately, as materiel overhead activities often involved the concurrent handling and transportation of GFM and non-GFM. Tr. 607:4-21, 636:1-13 (Chancio); Tr. 953:1-10 (Kopchick).

C. *Synopsis*

The government failed to carry its burden of proof and did not demonstrate that Sikorsky violated CAS 418. The evidence presented at trial established that the management and supervision costs contained within the materiel overhead pool were insignificant relative to the entire pool, and therefore CAS 418–50(d) did not apply to Sikorsky's allocation of its materiel overhead. Instead, Sikorsky was required to comply with CAS 418–50(e) when choosing an allocation base for its materiel overhead pool. In that respect, Sikorsky reverted to the third alternative base, a surrogate, because the first two bases were impractical. A proper surrogate would "var[y] in proportion to the services received." CAS 418–50(e)(3). The government did not establish that Sikorsky's method of allocation, direct labor, was not an appropriate allocation method under CAS 418–50(e). The government did not adequately support its contention that direct materiel should have been used to allocate the materiel overhead pool, nor did it provide any evidence to establish that CAS 418 required the use of an alternate method of allocation involving the segregation of GFM-related costs in a distinct indirect cost pool. In contrast, the evidence presented at trial demonstrated that Sikorsky's choice of a direct labor base complied with CAS 418–50(e) because direct labor varied in proportion to materiel overhead costs from 1999 through 2005 and thus was an acceptable means of measuring the resources consumed in connection with pool activities.

**CONCLUSION**

Although the government's contracting officer timely asserted a claim against Sikorsky contending that a violation of CAS 418 had occurred, the government did not prove by a preponderance of the evidence that Sikorsky's materiel overhead allocation method from 1999 through 2005 actually violated CAS 418. The government's failure of proof negates its claim for approximately $79.7 million plus interest that it alleged Sikorsky owed due to the claimed violation. Sikorsky thus prevails on its challenge to the government's claim. The clerk accordingly is directed to enter judgment for Sikorsky and against the government in these consolidated cases.

No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

24